T.C. Memo. 1995-490


UNITED STATES TAX COURT


SYLVIA OSTERBAUER AND ESTATE OF
JOSEPH OSTERBAUER, DECEASED, SYLVIA
OSTERBAUER, PERSONAL REPRESENTATIVE, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 10926-93.                     Filed October 10, 1995.


<u>Don C. St. Peter</u>, for petitioners.

<u>Thomas E. Ritter</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

FAY, <u>Judge</u>:  By statutory notice of deficiency, respondent determined a deficiency of $12,280 in the 1985 Federal income tax of Joseph Osterbauer, now deceased (decedent), and Sylvia Osterbauer (petitioner).

The issue for decision[1] is whether petitioners are entitled to deduct in 1985 a worthless debt as a business bad debt under section 166(a)(1)[2] or are limited to a deduction for a nonbusiness bad debt under section 166(d)(1). We hold that the debt is a nonbusiness bad debt, and, therefore, petitioners are limited to a short-term capital loss.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. We incorporate by this reference the stipulation of facts and attached exhibits.

Petitioner resided in Hamilton, Montana, on the date the petition was filed. Decedent passed away on September 12, 1990, prior to the date on which the petition was filed. Petitioner filed the petition on her own behalf and as personal representative for the estate of her husband, Joseph Osterbauer. Petitioner and decedent filed a joint Federal tax return for the 1985 tax year.

---

[1]There is an issue raised by the pleadings of whether petitioners realized a $619 gain on the repossession of certain property during 1985. Petitioners have offered no evidence on this issue and have not raised it on brief, so we conclude they have abandoned it.

[2]All section references are to the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.

Decedent, during his lifetime, worked primarily in the real estate business. Decedent was involved in subdividing and developing real estate, as well as building and purchasing residential rental property. Petitioner testified that decedent's interests were broad based, and, at various times in his life, he was also a farmer and held an interest in an oil well and a gold mining claim. Petitioner presented no evidence, except for her own self-serving testimony, that would indicate the exact breadth of decedent's various interests outside the scope of his general real estate business.

Petitioner spent much of her time at home with her four children; however, she had some limited involvement in the family real estate business. Petitioner assisted decedent in book-keeping chores and showed rental properties to prospective tenants as vacancies arose.

In 1984, decedent became involved in a gold mining venture, International Mining Research and Development, Inc. (International Mining). International Mining was a Montana corporation whose purpose was to engage in mining activities. Petitioner and decedent were among five investors in International Mining. Petitioner and decedent contributed four subdivided residential lots for a 20-percent stake in International Mining. Some of the other investors contributed some money to the project; however, others contributed instead their expertise. International Mining

was supposed to use the funds contributed by its investors to buy and develop gold mining property.[3]

Because decedent had a good reputation in Missoula, Montana, he was asked by the other investors to serve as president of International Mining.  He accepted the post.  Despite being president, decedent had no daily involvement in the business of International Mining, nor did he have operating control over the business of International Mining.

International Mining needed additional capital shortly after it was formed in order to continue operations.  International Mining attempted to secure a loan from the First State Bank of Stevensville, Montana (the Bank); however, the Bank was unwilling to make such a loan.  The Bank did lend $40,000, on March 23, 1984, to decedent and Warren E. Meader, another International Mining investor.  To secure the loan, the Bank required that decedent pledge his personally owned Cessna airplane as collateral.  Mr. Meader put up stock as collateral.  The loan proceeds were contributed to International Mining.  International Mining entered into a resolution on March 23, 1984, pledging proceeds from sales "for repayment of the $40,000.00 promissory note drawn by Joseph D. Osterbauer and Warren E. Meader in favor of First State of Stevensville Bank.  Said promissory note in

---

[3]It is unclear from the record whether any gold mining properties were ever bought by International Mining.

lieu of pledge has been secured by personal assets of Joseph D. Osterbauer."

By July 1984 International Mining had ceased operations. All of the other investors disappeared, and decedent was left to wind up the affairs of International Mining.  In order to pay off the $40,000 loan to the Bank, petitioner and decedent rolled over the $40,000 loan with other personal loans and refinanced the loans by the rollover.  In other words, they consolidated the loan with other personal loans and refinanced the loans by consolidation.  Petitioner testified at trial that upon investigation, it was found that the stock put up by Mr. Meader as collateral had no value.  The consolidated loan was eventually paid off by the sale of decedent's Cessna aircraft.

## OPINION

We must decide whether petitioner's and decedent's payments of International Mining's debts are deductible as business or nonbusiness bad debts under section 166.  It is undisputed that petitioner and decedent suffered a loss on the worthlessness of the debt due them from International Mining.

Section 166 provides in relevant part as follows:

> SEC. 166(a).  General Rule.--
>
> (1)  Wholly worthless debts.--There shall be allowed as a deduction any debt which becomes worthless within the taxable year.
>
> *       *       *       *       *       *       *
>
> (d)  Nonbusiness Debts.--

(1)  General rule.--In the case of a taxpayer other than a corporation--

(A)  subsections (a) and (c) shall not apply to any nonbusiness debt; and

(B)  where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months.

(2)  Nonbusiness debt defined.--For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than--

(A)  a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or

(B)  a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business.

Under section 166(a)(1), if a debt arose in the course of the taxpayer's trade or business, a loss is deductible against ordinary income in the year in which the debt becomes worthless. Sec. 1.166-9(a), Income Tax Regs.  However, under section 166(d)(1)(B), where a debt is a nonbusiness bad debt, a loss must be treated as a short-term capital loss subject to the limitations of section 1211.  Under section 1.166-9, Income Tax Regs., a payment by a taxpayer in discharge of his or her obligations as a guarantor is treated as a business bad debt if the guaranty is entered into in the course of the taxpayer's trade or business. If, however, the guaranty is entered into as a transaction for profit, but not in the course of the taxpayer's trade or busi-

ness, the regulation provides that the discharging payment is a nonbusiness bad debt. Sec. 1.166-9(b), Income Tax Regs.

The question of whether a debt is a business or nonbusiness bad debt is essentially a question of fact, the resolution of which depends upon whether the debt is "proximately" related to the trade or business of the taxpayer. Sec. 1.166-5(b)(2), Income Tax Regs. In determining whether a bad debt had a "proximate" relation to the taxpayer's trade or business, the Supreme Court has stated that the proper measure is the dominant motivation of the taxpayer in making the loan. United States v. Generes, 405 U.S. 93, 103 (1972). The taxpayer's motive is assessed at the time the guaranty was made. Harsha v. United States, 590 F.2d 884 (10th Cir. 1979).

Petitioner first argues that, had decedent not agreed to secure a loan for International Mining, the corporation would have failed, negatively affecting petitioner's and decedent's business dealings in the community. Petitioner argues that the dominant motivation in making the loan was to protect the real estate business. Petitioner offers only her own testimony to support this argument and offers no facts that suggest that, when International Mining did fail, any of the real estate business interests were negatively affected. Petitioner and decedent next contend that their dominant motivation in lending the money to International Mining was to protect their "good name" in the community where they lived. Petitioner and decedent argue that

failing to pay off the debt would have soured their relationship with the Bank which held the mortgage on some of their real estate projects. Petitioner and decedent presented no evidence to support this claim other than petitioner's testimony to that effect. Moreover, while petitioner and decedent contend that forcing the bank to foreclose on its collateral, the Cessna airplane, would have soured their relationship with the Bank, the parties have stipulated that the debt was in fact fully paid with the proceeds of the sale of the Cessna plane. Petitioner and decedent presented no evidence that, had the Bank been forced to foreclose on this debt, their real estate business would have been adversely affected. There is no evidence to support petitioner's and decedent's contention that the Bank would have called all of petitioner's and decedent's outstanding loans if the Bank had foreclosed on this loan.

Petitioners contend on brief that the size of their investment in International Mining is a factor tending to show that their dominant motive in guaranteeing the debt was a business one. Petitioners' reliance on Litwin v. United States, 983 F.2d 997 (10th Cir. 1993), and Kelson v. United States, 503 F.2d 1291 (10th Cir. 1974), to support their contention that the size of petitioner's and decedent's investment is persuasive evidence of petitioners' motive is misplaced. Petitioners assert that, where the investment is relatively small, a dominant business motive is more likely. Petitioners appear to arrive at this conclusion

from language in <u>Litwin</u> stating that a court is more likely to find a nonbusiness loan where the taxpayer's investment is relatively large, the taxpayer's salary is relatively small, and the taxpayer's other sources of income are relatively large. <u>Litwin v. United States</u>, <u>supra</u> at 1000.  It does not follow that a small investment is more likely to be made in a taxpayer's trade or business.  The court in <u>Litwin</u>, referring to a situation where three factors existed, (1) a large investment, (2) a small salary, and (3) large alternative sources of income, concluded that, in that instance, a nonbusiness motive is more likely.  The court did not say that, independent of all other factors, size of investment alone will be determinative.  Furthermore, even should we accept petitioners' statement as true, petitioners have put forth no evidence as to the value of the four parcels of land that petitioner and decedent contributed to International, and, thus, we do not know the size of their investment.

In order to determine a taxpayer's dominant motivation, it is often helpful to determine how the taxpayer would have benefited if the loan had not gone bad.  When the creditor or guarantor of a corporate debt is a shareholder/investor and also an employee, mixed motives for the loan or guaranty are often present, and the critical issue becomes which motive is dominant. <u>Id.</u> at 1000.  In the case at bar, petitioners would have bene-fited in that the value of their stock in International Mining would have gone up or dividends could have been paid to them.

The increase in value of stock is the type of capital increase that suggests a nonbusiness motive. See Whipple v. Commissioner, 373 U.S. 193 (1963).

Petitioner and decedent argue further that their investment in International Mining, a gold mining venture, is proximately related to their business of subdividing and developing rental real estate. We find that it is not. Petitioner and decedent were merely investors in this corporation. Gold mining was not a real estate venture of the type that would be considered to be part of petitioners' trade or business. Mining is quite different from general real estate ventures, and petitioners have failed to put forth sufficient evidence such that we could conclude that they engaged in a trade or business so broad as to encompass mining.

"[I]nvesting is not a trade or business". Id. at 202. This venture was an investment unrelated to petitioner's and decedent's trade or business. Therefore, we hold that petitioner's and decedent's loans to International Mining, which became worthless, are nonbusiness bad debts within the meaning of section 166(a).

Decision will be entered

under Rule 155.