**In re Robert William MILLS, Debtor.**

**Robert William MILLS, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Bankruptcy No. 92–28132–B.**
**Adv. No. 94–1106.**

United States Bankruptcy Court,
W.D. Tennessee.

Dec. 5, 1995.

Michael J. Martineau, Trial Attorney, Tax Division, U.S. Department of Justice, Washington, DC, for U.S.

Thomas A. Buckner, Kristin A. Lazo, Apperson, Crump, Duzane & Maxwell, Memphis, Tennessee.

Michael P. Coury, Humphreys, Dunlap, Wellford, Acuff and Stanton, Memphis, Tennessee, for debtor.

## MEMORANDUM OPINION ON COMPLAINT TO DETERMINE VALIDITY AND EXTENT OF CERTAIN ASSERTED TAXES AND CLAIM FOR REFUND

WILLIAM H. BROWN, Bankruptcy Judge.

At issue in this core proceeding [1] for determination of tax liability [2] is whether a deduction claimed by the debtor on his 1989 tax return is properly classified as a business bad debt under the Internal Revenue Code ("I.R.C."). It is the defendant's position that the particular debt was a nonbusiness debt as that term is defined by section 166(d) of the I.R.C. 26 U.S.C. § 166(d). Both the debtor and the case trustee contend that the bad debt resulted from business loans. Although the debtor is the named plaintiff, the real plaintiff is the chapter 7 trustee who is seeking a tax refund. If the debt is classified as a business debt, the estate is entitled to receive an income tax refund of $53,291 for the tax year 1987, for which the trustee has filed an amended return. The Internal Revenue Service ("IRS") has assessed an income tax deficiency against the debtor, which totalled $253,809.95 as of October, 1994, reserving a setoff against any refund. The follow-

---

1. 28 U.S.C. § 157(b)(2)(A), (E) and (O).

2. 11 U.S.C. § 505(a).

ing constitutes findings of fact and conclusions of law in accordance with FED. R.BANKR.P. 7052.

## FINDINGS OF FACT

The debtor filed his voluntary petition for chapter 7 relief on July 31, 1992. Prior to that time, the debtor held interests in several partnerships and corporations. According to the debtor's testimony and exhibits, the debtor owned a 24% interest in Alabama Commercial College to which he loaned $300,000 in 1988 and $100,000 in 1989. Trial Exs. 1 and 2. He additionally loaned $30,000 to M & M Travel, Inc., a corporation owned by his former wife, in March of 1989. Trial Ex. 4. Further, on January 31, 1990, the debtor and a friend financed a restaurant named Cuisine International, Inc. in Dothan, Alabama. The debtor's loan to Cuisine International, Inc. was $264,767.62. Trial Ex. 3. Most significant for purposes of this tax dispute is the debtor's 50% ownership interest in Component Systems, Inc. ("CSI"), a Tennessee corporation organized in 1979. At that time the debtor was engaged in the construction of homes and apartments. The debtor's initial investment in CSI was $22,500. CSI was in the business of producing fabricated building component packages, which it sold to large commercial builders including Monark Homes, Inc., another corporation in which the debtor held a one third ownership interest.

In addition to his shareholder interest in CSI, the debtor was its vice president and treasurer. He worked at CSI on a daily basis, where he ran the computer engineering services for cutting trusses, oversaw accounts receivable, and supervised employees. For his services, CSI paid the debtor an annual salary of $30,000 for the years 1986 through 1989.

CSI began having financial problems in the mid and late 1980's due to difficulties collecting its accounts receivable. From 1986 to 1989 the debtor made cash advances to CSI for its business operations in exchange for which CSI executed promissory notes payable at the market rate of interest.[3] Significant repayments were made on some of the notes.[4] CSI's collections did not improve and on December 21, 1989, CSI followed the lead of its large customers in seeking protection under chapter 11 of the Bankruptcy Code. At that time, CSI's aggregate outstanding indebtedness to the debtor was $607,758.[5] The debtor testified that his loans to CSI were made to protect his salary, the salaries of other CSI employees, his reputation, and CSI's ongoing business.

Because many of CSI's customers had already filed for bankruptcy relief, the debtor decided that his loans to CSI were worthless, notwithstanding CSI's continuation as a debtor in possession for one year after its chapter 11 filing. Therefore, Mr. Mills claimed a business bad debt deduction in the amount of $607,758 on schedule C of his joint federal income tax return for 1989. Trial Ex. 1. This same income tax return establishes that the debtor's gross wage and salary income for 1989 was $1,586,616. *Id.* The income over CSI's salary was received from Riley College [6] in Alabama where the debtor was a shareholder and director. According to the debtor, the Riley College income resulted from a Subchapter S corporate divestiture and was a one time payment. Further, according to the debtor, his $30,000 salary from CSI was his only existing and anticipated salary at the time his 1989 federal income tax return was prepared.

The debtor's 1990 joint federal income tax return showed a loss of $226,284 reflecting losses from partnerships and Subchapter S

3. Trial Exhibit 11 reveals that Mr. Mills loaned CSI the following totals:

| | |
|------|------------|
| 1986 | $ 2,074.46 |
| 1987 | $ 26,000.00 |
| 1988 | $476,183.71 |
| 1989 | $103,500.00 |

4. $124,810.13 was repaid in 1989. Trial Ex. 11.

5. This is the total of the 1986–1989 loans reflected in Trial Exhibit 11 (see note 3). Although

note 4 indicates that repayments on some loans were made in 1989, in the absence of explanatory testimony the Court assumes that the $607,-758.17 loans itemized in note 3 reflect the loans remaining unpaid at the time CSI filed its Chapter 11 petition.

6. Riley College was owned and operated by Alabama Commercial College.

corporations in which the debtor held ownership interests. Trial Ex. 6. The debtor's 1990 salary from CSI was $22,500. He earned $18,000 in Riley College director's fees that year and had significant taxable interest income. *Id.* After the debtor filed his individual chapter 7 petition, his prepetition tax returns were analyzed by the case trustee's attorneys. The trustee subsequently filed an amended federal income tax return for the debtor for 1987, carrying back the 1990 net loss of $138,418 to the tax year 1987, which resulted in a claimed refund in the amount of $53,291. Trial Ex. 8. This refund would be for the benefit of the bankruptcy estate and not for the debtor.

Following the filing of the amended 1987 return, the IRS audited the debtor's 1989 tax return and disallowed the business bad debt deduction at issue, contending that the debt was a nonbusiness bad debt as defined at section 166(d) of the I.R.C.

### DISCUSSION

If the debtor's unpaid loans to CSI are classified as a business bad debt, the chapter 7 estate will receive a tax refund of $53,291. Conversely, if the loans made to CSI are classified as nonbusiness bad debts, the estate will not receive a refund. The effect of the latter result on the debtor individually is not an issue before this Court. The only issue required to be decided by this Court, at this time, is whether or not loans made by the debtor to CSI are business bad debts or nonbusiness bad debts under 26 U.S.C. § 166 and applicable case law. Therefore, analysis is restricted to that issue alone.

■■■ The debtor took a bad debt deduction under subsections 166(a) and (d), which provide:

(a) General Rule.—

(1) Wholly worthless debts.—There shall be allowed as a deduction any debt which becomes worthless within the taxable year.

(d) Nonbusiness Debts.—

(1) General Rule.—In the case of a taxpayer other than a corporation—

(A) subsection (a) shall not apply to any nonbusiness debt; and

(B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 1 year.

(2) Nonbusiness debt defined.—For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than—

(A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or

(B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business.

As the United States Tax Court has recently explained,

Under section 166(a)(1), if a debt arose in the course of the taxpayer's trade or business, a loss is deductible against ordinary income in the year in which the debt becomes worthless. Sec. 1.166–9(a), Income Tax Regs. However, under section 166(d)(1)(B), where a debt is a nonbusiness bad debt, a loss must be treated as a short-term capital loss subject to the limitations of section 1211. Under section 1.166–9, Income Tax Regs., a payment by a taxpayer in discharge of his or her obligations as a guarantor is treated as a business bad debt if the guaranty is entered into in the course of the taxpayer's trade or business. If, however, the guaranty is entered into as a transaction for profit, but not in the course of the taxpayer's trade or business, the regulation provides that the discharging payment is a nonbusiness bad debt. Sec. 1.166–9(b), Income Tax Regs.

*Osterbauer v. Commissioner of Internal Revenue,* 1995 WL 594303 at p. 2, 70 T.C.M. (CCH) 988, T.C.M. (P–H) 95,490 (U.S.Tax Ct. Oct. 10, 1995).

The Code of Federal Regulations ("C.F.R.") echoes the Tax Code's negative definition but adds that "[t]he question of whether a debt is a nonbusiness debt is a question of fact in each particular case." 26 C.F.R. § 1.166–5(b)(2). The regulation further states:

. . . the character of the debt is to be determined by the relation which the loss

resulting from the debt's becoming worthless bears to the trade or business of the taxpayer. If that relation is a proximate one in the conduct of the trade or business in which the taxpayer is engaged at the time the debt becomes worthless, the debt comes within the exception provided by [26 I.R.C. § 166(d)(2) ]. The use to which the borrowed funds are put by debtor is of no consequence....

*Id.*

In the leading case on this issue, the United States Supreme Court has concluded that in order for a bad debt to have the requisite proximate relation to the taxpayer's trade or business and thus qualify as a business bad debt, the taxpayer's promotion of trade or business must have been the dominant motive behind the taxpayer's loan or guaranty. *United States v. Generes,* 405 U.S. 93, 103, 92 S.Ct. 827, 833, 31 L.Ed.2d 62 (1972), *reh'g den.,* 405 U.S. 1033, 92 S.Ct. 1274, 31 L.Ed.2d 491 (1972). In *Generes,* the taxpayer originally invested $38,900 in a corporation, to which he later loaned $158,814.49 and for which he indemnified a construction performance bond of $162,104.57. The taxpayer claimed a business bad debt loss for the indemnity and asserted that his indemnity motive was to protect his $12,000 per year employment. The Court explained that in the *Generes* case, as in this one, the taxpayer had a dual status relative to the borrowing corporation as both a shareholder and an employee. 405 U.S. at 100, 92 S.Ct. at 831. According to the *Generes* Court, "[t]hese interests are not the same, and their differences occasion different tax consequences." *Id.* Thus, in "tax jargon," shareholder status was a nonbusiness interest while employee status was a business interest for purposes of I.R.C. § 166(d). A shareholder's nonbusiness interest was "capital in nature" and

composed initially of tax-paid dollars. Its rewards were expectative and would flow, not from personal effort, but from investment earnings and appreciation. On the other hand, [the taxpayer's] status as an employee was a business interest. Its nature centered in personal effort and labor, and salary for that endeavor would be

received. The salary would consist of pretax dollars.

*Id.* at 100–101, 92 S.Ct. at 832.

The United States Tax Court recently confirmed that "[t]he question of whether a debt is a business or nonbusiness bad debt is essentially a question of fact, the resolution of which depends upon whether the debt is 'proximately' related to the trade or business of the taxpayer." *Osterbauer,* 1995 WL 594303, p. 3 (citing to 26 C.F.R. § 1.166–5(b)(2)). The *Osterbauer* Court then went on to point out that "[i]n determining whether a bad debt had a 'proximate' relation to the taxpayer's trade or business, the Supreme Court has stated that the proper measure is the dominant motivation of the taxpayer in making the loan." *Osterbauer,* 1995 WL 594303, p. 3 (citing *United States v. Generes,* 405 U.S. at 103, 92 S.Ct. at 833). The Supreme Court not only stated in *Generes* that "the proper measure is that of dominant motivation" but also that mere "significant motivation is not sufficient." *Generes,* 405 U.S. at 103, 92 S.Ct. at 833. In so holding the Supreme Court placed a high standard on the taxpayer. The taxpayer has the burden of proving that the dominant motivation supports a business bad debt deduction. *See, e.g., Smith v. Commissioner of Internal Revenue,* 60 T.C. 316, 318 (U.S.Tax Ct.1973).

In *Kelson v. United States,* 503 F.2d 1291 (10th Cir.1974), the Tenth Circuit applied the *Generes* standard. The *Kelson* Court pointed out that "the objective facts surrounding loans, rather than the subjective intent control" and that "the courts should compare the accompanying risks of the loans with the potential reward." Furthermore, "[e]vidence of a large disparity between loans and the taxpayer's salary is of some weight." 503 F.2d at 1293. Applying these factors to the case at hand reveals that there is indeed a large disparity between the loans of $607,000 and Mr. Mills' annual salary of $30,000. The *Kelson* opinion illustrates that a trial court should weigh all facts presented in each case.

The debtor and the case trustee rely upon the District Court opinion in *Litwin v. United States,* 1991 WL 75945 (D.Kan.1991). The related appellate opinion, *Litwin v. United States,* 983 F.2d 997 (10th Cir.1993), upheld

the District Court. There, the Tenth Circuit discussed three objective factors that may be used to determine the taxpayers' dominant motivation: "(1) the size of the taxpayer's investment, (2) the size of taxpayer's after-tax salary, and (3) other sources of gross income available to the taxpayer." 983 F.2d at 1000. The *Litwin* Court further observed "that a court is more likely to find that a taxpayer made a non-deductible loan (i.e., one 'dominated' by the nonbusiness motive of protecting an investment) where the taxpayer's investment is relatively large, the taxpayer's salary is relatively small, and the taxpayer's other sources of income are relatively large." *Id.*

*Litwin* does not dictate the outcome of this proceeding, as ultimately, each case is fact specific. This is clearly seen in the recent Tax Court analysis of *Litwin:*

> Petitioners' reliance on *Litwin v. United States,* 983 F.2d 997 (10th Cir.1993), and *Kelson v. United States,* 503 F.2d 1291 (10th Cir.1974), to their contention that the size of petitioner's ... investment is persuasive evidence of petitioners' motive is misplaced. Petitioners assert that, where the investment is relatively small, a dominant business motive is more likely. Petitioners appear to arrive at this conclusion from language in *Litwin* stating that a court is more likely to find a nonbusiness loan where the taxpayer's investment is relatively large, the taxpayer's salary is relatively small, and the taxpayer's other sources of income are relatively large. *Litwin v. United States, supra* at 1000. It does not follow that a small investment is more likely to be made in a taxpayer's trade or business. The court in *Litwin,* referring to a situation where three factors existed, (1) a large investment, (2) a small salary, and (3) large alternative sources of income, concluded that, in that instance, a nonbusiness motive is more likely. The court did not say that, independent of all other factors, size of investment alone will be determinative.

*Osterbauer,* 1995 WL 594303, p. 3.

■ Application of the *Generes* standard and analysis of the objective factors present in this case lead to a finding that this particu-

lar bad debt was, in fact, a nonbusiness bad debt as defined in 26 U.S.C. § 166(d)(2). The proof here established that the debtor's original investment of $22,500 in CSI was relatively small when compared to his $607,-758 unpaid loans to CSI. His annual CSI pretax salary of $30,000 was also relatively small when compared to his loans, and the aftertax net salary would be smaller still. Moreover, his 1989 CSI salary was a small percentage of his salary income for that year. Mr. Mills testified on cross examination that he made the loans to CSI out of concern for his employment and salary, but he also stated that he was concerned about keeping CSI afloat, protecting the other employees' salaries, and protecting his business reputation. As in *Osterbauer,* the plaintiff presented no proof to support jeopardy to his reputation, other than Mr. Mills' conclusory testimony. 1995 WL 594303, p. 3. Mr. Mills formed CSI to fabricate construction components that would enhance his existing construction business. In contrast to *Litwin,* 983 F.2d at 999, there is no proof that CSI was formed for the principal purpose of employing Mr. Mills. Mr. Mills' concern for maintaining CSI as a business entity, while admirable, is a shareholder/investor concern more than a purely employee concern. "[I]nvesting is not a trade or business." *Whipple v. Commissioner of Internal Revenue,* 373 U.S. 193, 202, 83 S.Ct. 1168, 1174, 10 L.Ed.2d 288 (1963), *reh'g. den.* 374 U.S. 858, 83 S.Ct. 1863, 10 L.Ed.2d 1082 (1963). It certainly may be true that a corporate officer has some business interest in "keeping the business going." *United States v. Generes,* 405 U.S. at 114, 92 S.Ct. at 838 (J. Douglas, dissenting). However, under the facts of this case, there is no proof that Mr. Mills' official positions with CSI required him to make loans to CSI, and it is not plausible that Mr. Mills acted as a $30,-000 per year salaried employee to loan over $600,000 to his employer out of a dominant business motivation to protect his salary. It could take up to twenty years to recover the value of such a loan in aftertax salary alone. "The taxpayer's motive is assessed at the time the [loan] was made." *Osterbauer,* 1995 WL 594303, p. 3 (citing *Harsha v. United States,* 590 F.2d 884 (10th Cir.1979)). Mr. Mills testified that when the loans were made

between 1986 and 1989, he hoped for repayment out of CSI's accounts receivable. However, trial exhibits 9 and 11 reflect that in 1988 Mr. Mills loaned CSI $476,283.71, when CSI's tax return showed an operating loss of $197,067. An employee, acting predominantly out of business motivation, would not have an incentive to make such a risky loan. This was a loan made by an investor hoping to salvage the business. The Court is satisfied that Mr. Mills had multiple motives in making the loans to CSI but the proof does not persuade the Court that his dominant motive was that of an employee.

"In order to determine a taxpayer's dominant motivation, it is often helpful to determine how the taxpayer would have benefitted if the loan had not gone bad." *Osterbauer,* 1995 WL 594303, at p. 3. There was no specific proof on this in the present case. However, the size of the loan compared to the salary at the time of the loans would indicate that the primary benefit would be to enhance the value of the corporation rather than the protection of Mr. Mills' salary. It is significant that Mr. Mills was also a principal shareholder of Monark Homes, Inc., which was formed to purchase construction components from CSI. Thus, CSI's failure would affect adversely another of Mr. Mills' investments. Weighing all factors logically leads to a finding that an investment motivation was dominant.

The trustee also argues that Mr. Mills was in the business of organizing, promoting, financing, and selling corporate businesses and that his loans to CSI were a part of that business activity. This argument is inherently inconsistent with the contention that these were business loans made by a corporate employee for salary and employment protection. Moreover, the proof does not support a finding that Mr. Mills was in the business of money lending or of organizing, promoting, financing, and selling corporate enterprises. There is proof that Mr. Mills loaned money to various business entities in which he was involved and that some of the entities in which he invested were sold. Mr. Mills testified that he was an investor hoping for a return, for a growth in business and for an improved salaried position. Specifically,

as to Alabama Trade Schools to which he loaned money, Mr. Mills stated that he was an investor hoping for a return on his investment. For his loans he received only the promise of interest and return of principal, with no additional loan fees. He did not receive a fee to organize, promote, finance, or sell businesses; rather, he received director's fees and employee salaries. Weighing all of the evidence, the Court finds that Mr. Mills was not loaning money to CSI as a part of a money lending business enterprise, or as a corporate organizer, promoter, or financier. Considering the objective facts surrounding the loans, including but not limited to the investment activities of the debtor, the dollar amounts involved in these activities, and the other sources of income to the debtor, the Court has made a comparison between the accompanying risks of the loans and the accompanying rewards. The expected return of such loans is that of an investor more than an employee. As the Supreme Court has stated,

> Devoting one's time and energies to the affairs of a corporation is not of itself, and without more, a trade or business of the person so engaged. Though such activities may produce income, profit or gain in the form of dividends or enhancement in the value of an investment, this return is distinctive to the process of investing and is generated by the successful operation of the corporations' business as distinguished from the trade or business of the taxpayer himself. When the only return is that of an investor, the taxpayer has not satisfied his burden of demonstrating that he is engaged in a trade or business since investing is not a trade or business and the return to the taxpayer, though substantially the product of his services, legally arises not from his own trade or business but from that of the corporation. Even if the taxpayer demonstrates an independent trade or business of his own, care must be taken to distinguish bad debt losses arising from his own business and those actually arising from activities peculiar to an investor concerned with, and participating in, the conduct of the corporate business.

*Whipple v. Commissioner of Internal Revenue,* 373 U.S. at 202, 83 S.Ct. at 1174.

This Court is persuaded that under § 166(d)(2) of the Internal Revenue Code, 26 C.F.R. § 1.166–5(b), and the standards defined in *Whipple* and *Generes,* the bad debt represented by the unpaid loans made by Mr. Mills to CSI was a nonbusiness bad debt. As such, it was proper for the IRS to disallow the deduction taken by the debtor in 1989. That disallowance will result in denial of the trustee's claimed refund for 1987. As a result of these findings, it is unnecessary for the Court to address whether the debt became wholly worthless in 1989. An appropriate order and judgment will be entered.