**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**May 9, 2014**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

TARA WOODS LIMITED
PARTNERSHIP, a Minnesota limited
partnership,

      Plaintiff - Appellant,

v.

FANNIE MAE, a federally chartered
corporation; EICHLER, FAYNE &
ASSOCIATES, a Michigan general
partnership, a/k/a EF&A Funding, LLC,
d/b/a Alliant Capital, LLC,

      Defendants - Appellants.

No. 12-1187
(D.C. No. 1:09-CV-00832-MSK-MEH)
(D. Colo.)

**ORDER AND JUDGMENT**[*]

Before **BRISCOE**, Chief Circuit Judge, **O'BRIEN**, and **PHILLIPS,** Circuit Judges.

Tara Woods, a Minnesota limited partnership, executed a ten-year, $19.6 million

loan from Eichler, Fayne & Associates (EF&A), to refinance a 53-building apartment

---

[*] This order and judgment is an unpublished decision, not binding precedent. 10th Cir. R. 32.1(A). Citation to unpublished decisions is not prohibited. Fed. R. App. 32.1. It is appropriate as it relates to law of the case, issue preclusion and claim preclusion. Unpublished decisions may also be cited for their persuasive value. 10th Cir. R. 32.1(A). Citation to an order and judgment must be accompanied by an appropriate parenthetical notation – (unpublished). *Id.*

complex in Denver, Colorado. EF&A immediately assigned the loan to the Federal National Mortgage Association (FNMA, also known as Fannie Mae),[1] but continued to service it as Fannie Mae's agent. About seven years later, in November 2006, Fannie Mae started a foreclosure action primarily based on Tara Woods' failure to repair and maintain the property and to keep it lien-free. The foreclosure was withdrawn in March 2007 and Tara Woods sold the property in May 2008 for $20 million. Tara Woods filed suit against EF&A and Fannie Mae in 2009. It alleged the foreclosure action was baseless and had stigmatized the property so that Tara Woods received less on the sale than it would have garnered had Fannie Mae not unreasonably interfered. Judgment was entered in favor of Fannie Mae and EF&A. We affirm.

## FACTUAL BACKGROUND

The apartment complex, Stone Creek Village Apartments (Stone Creek), was built around 1973. Originally, it contained 53 two and three-story apartment buildings with 450 apartment units, two swimming pools, a clubhouse and an office. Tara Woods, effectively owned by Andrew Grossman, bought Stone Creek in 1991. In 1999, Tara Woods refinanced Stone Creek with the loan from EF&A. The relevant loan documents included (1) a Note (2) a Deed of Trust assigning rents, granting a lien to EF&A on the property, and requiring, among other things, the preservation of the property's condition over the life of the loan, and (3) a Replacement Reserve and Security Agreement

---

[1] The FNMA is referred to in the complaint, case captions, briefs and arguments as Fannie Mae. Apparently it does not mind.

(Replacement Agreement) creating an escrow fund for repairs and replacements, with an attachment identifying $30,400 in repairs to be made in the first year of the loan and a schedule for replacements of equipment over the life of the loan.  The replacements and repair estimates were based on a March 1999 Physical Needs Assessment (PNA) of the property conducted by a third party for EF&A.  The Replacement Agreement further provided:

> If at any time during the term of the Loan, Lender determines that replacements not listed on Exhibit A are advisable to keep the Property in good order and repair and in good marketable condition, or to prevent the deterioration of the Property . . . Lender, may send Borrower written notice of the need for making such Additional Replacements.

(Appellant's App'x Vol. I at 118.)

The 1999 report described Stone Creek "to be in average condition and generally, well maintained."  (Appellant's App'x Vol. II at 374.)  As of March 3, 1999, 90.7% of the units were occupied and 93.6% of the units were leased.

The first written expression of concern regarding the condition of the property came in a letter from EF&A to Tara Woods following the annual 2004 inspection.  The August 19, 2004, letter listed twenty-five maintenance concerns which included, among other things, leaking roofs, damaged sidewalks, missing stairway handrails, "[n]umerous heating and cooling system issues," and "[n]umerous waterline and plumbing issues." (Appellees' Supp. App'x Vol. I at 3.)  The letter notified Tara Woods the property would be added to EF&A's "Watch List."  (*Id.*)

In late 2004, two apartment buildings were totally destroyed in a fire.  In the Spring of 2005, Grossman decided to sell Stone Creek.  The property was listed at $37

million in May 2005.[2]  On July 1, a second fire destroyed another building at Stone Creek.  At that point, Tara Woods decided it would raze the two buildings destroyed in the first fire, rebuild the apartments destroyed by the second fire, and reduce the list price to $35.5 million.

On July 15, 2005, EF&A conducted another property inspection.  This inspection led to another PNA, which was conducted on August 15-16, 2005.  According to the report, Stone Creek needed "immediate repair[s]"[3] at a cost of $955,165.00.  (Appellant's App'x Vol. II at 426.)  Relevant to Tara Woods' claims, the report recommended replacement of the property's twenty-five boilers at a total cost of $162,500.00 over five years.  The next day, Fannie Mae sent Tara Woods a default notice based on its failure to maintain the condition of the property as required by the Deed of Trust.  Tara Woods did not complete the suggested replacements and repairs.

In December 2005, Tara Woods and a potential buyer signed a contract for sale for a price of $31.3 million, subject to due diligence.  By early February 2006, based on the poor condition of the property identified in the buyer's inspection report, the buyer requested a price reduction to $28,550,000 and provided Tara Woods a copy of the report.  It stated, "[g]enerally, the [property] was considered to be in poor condition.  The

---

[2] Fannie Mae obtained a broker's opinion of value on the property in June 2005 in the amount of $26 million.

[3] "Immediate repair needs" were defined as urgent items that:  (1) "[e]ndanger the safety and well-being of residents, visitors and passersby," (2) "[a]dversely affect ingress or egress," (3) "[a]re material building or fire code violations," or (4) "[e]xhibit deferred maintenance."  (Appellant's App'x Vol. II at 426.)

[property] exhibits a number of material physical deficiencies as a result of extensive deferred maintenance, inherent defects related to construction, and systems and components that have long exceeded their expected useful lives."[4]  (Appellees' Supp. App'x Vol. I at 126.)  Tara Woods rejected the reduced offer.

On February 16, 2006, Fannie Mae sent Tara Woods a second notice of default. The letter based the default on deterioration to the property, the failure to fully remediate the fire damage, and encumbrances against the property.  The notice gave specific dates on which the deficiencies must be cured.  It stated:  "While Fannie Mae understands that there is, perhaps, a potential sale of the Mortgaged Property under consideration, in order to fully protect the Mortgaged Property, the borrower must comply with its obligations under the Loan Documents."  (*Id*. at 108.)

During 2006, Tara Woods continued to receive offers on Stone Creek, but the buyers either lowered their offers or terminated negotiations after conducting due diligence.  No sale was completed.  At the same time, the reputable property management company, which had managed Stone Creek, cancelled its contract in March 2006 due to Tara Woods' failure to provide funds for necessary maintenance and repairs.  Fannie Mae

---

[4] The report stated immediate repairs of the electrical system were required at a cost of $217,260.00.  Immediate action repairs were described as:  "(1) existing or potentially material unsafe conditions; (2) material adverse physical deficiencies jeopardizing existing tenancy; (3) material building code violations; (4) poor or deteriorated condition of a critical element or system; and (5) a condition, that if left 'as is,' with an extensive delay in remedying the same, would result in or contribute to a critical element or system failure within one year or a significant increase in its remedial cost."  (Appellees' Supp. App'x Vol. I at 161.)  In addition, the report identified short term repairs (to be done within one year) that totaled $2,291,820.

sent additional notices of default on June 26, 2006, and September 27, 2006, continuing to refer to the deterioration of the property and the existence of liens. The September notice advised Tara Woods that Fannie Mae would be conducting yet another PNA.

On November 1, 2006, based on Tara Woods' failure to cure the previously noticed defaults, Fannie Mae declared the entire note due and payable, giving Tara Woods until November 9 to cure. On November 6, 2006, Grossman met with Frank Yanez, a Fannie Mae supervisor, regarding the status of Stone Creek, as well as the status of two other apartment complex loans Grossman had secured from Fannie Mae.[5] According to Grossman, when he told Yanez he planned to surrender one of his two Oklahoma properties to Fannie Mae, Yanez responded angrily, stating he would not allow Grossman to "hit home runs" by selling the two properties in which Grossman had considerable equity while leaving Fannie Mae with the property with the least equity. (Appellant's App'x Vol. II at 355.)

In the meantime, the latest Stone Creek PNA was completed in October 2006. It identified costs of $247,570.00 in necessary life-safety repairs and approximately $2.5 million in immediate repairs and replacements.[6] Part of this assessment included

---

[5] At the time Grossman executed the loan for Stone Creek, he, through two other entities, executed loans with EF&A (which were assigned to Fannie Mae) for two other apartment complexes located in Oklahoma. These two loans are not directly the subject of Tara Woods' complaint, but claims Grossman's suggestion that he would return one of these properties to Fannie Mae triggered the Stone Creek foreclosure.

[6] The 2006 report defined immediate repair needs in the same way these needs were identified in 2005. *See supra* n.3.

immediate replacement of all boilers, now estimated to cost over $1 million. Fannie Mae commenced a foreclosure on November 30, 2006, and filed a motion for an order of sale of Stone Creek on December 28, 2006, pursuant to Colo. R. Civ. P. 120 ("Rule 120"). The foreclosure was based principally on defaults due to the property's condition and the existence of liens on the property. Tara Woods received a copy of the 2006 PNA on January 5, 2007, and soon thereafter filed its opposition to the Rule 120 motion, claiming Fannie Mae's default allegations were baseless.

A January 18, 2007, letter from Fannie Mae demanded Tara Woods either make the immediate repairs and replacements identified in the 2006 PNA by February 19, 2007, or escrow sufficient funds ($2,643,764) by January 29, 2007, for their completion. Tara Woods did neither. Instead, pending the completion of the Rule 120 hearing, the parties agreed Fannie Mae would dismiss the foreclosure proceeding. It did so on March 23, 2007.

The dispute did not end there. In March 2007, EF&A, on behalf of Fannie Mae, notified Tara Woods of other defaults on the loan, including the issuance of a notice from the City of Denver concerning asbestos on the property. Tara Woods continued its efforts to sell the property, but according to Tara Woods, it was now in an unfavorable post-foreclosure environment with the additional stigmatization of the plainly-seen asbestos abatement. It again received offers either withdrawn or reduced after due diligence. Tara Woods rejected all final offers. On August 2007, Tara Woods commissioned a property condition report in preparation for an auction of the property. The report described the site improvements and buildings to be in "poor condition and

appear to have received below average maintenance." (Appellees' Supp. App'x Vol. I at 35.) It also anticipated "[s]ignificant additional replacement due to deferred maintenance." (*Id.*) The report estimated a cost of $1.849 million for the needed immediate repairs. No bids were received at the subsequent auction. Tara Woods eventually sold the property in May 2008 for $20 million and paid the loan in full.

## PROCEDURAL BACKGROUND

Tara Woods filed this lawsuit against EF&A and Fannie Mae in state court on March 11, 2009. It alleged numerous claims. Relevant here, it claimed: (1) tortious interference with prospective business advantage; (2) breach of fiduciary duty; and (3) breach of contract and the implied covenant of good faith and fair dealing. After removal to federal district court, Fannie Mae moved for partial judgment on the pleadings under Fed. R. Civ. P. 12(c). Tara Woods then amended its complaint.[7] This was followed by Fannie Mae's motion to dismiss all claims under Fed. R. Civ. P. 12(b)(6).

The motions were partially successful. The judge dismissed Tara Woods' claim for breach of fiduciary duty[8] and most of the tortious interference claim based on the relevant limitations period. What remained of this claim was dismissed on a subsequent

---

[7] Because EF&A acted solely as Fannie Mae's agent, for convenience we refer to the defendants as Fannie Mae unless otherwise noted.

[8] Tara Woods also alleged Fannie Mae breached its fiduciary duty in managing the escrow funds. This claim was dismissed based on Colorado's economic loss rule, which bars a tort claim for injuries resulting from an alleged breach of contract. *See Tara Woods Ltd. P'ship v. Fannie Mae*, 731 F. Supp. 2d 1103, 1118 (D. Colo. 2010). Tara Woods does not challenge this ruling.

motion for partial summary judgment. A bench trial was held on Tara Woods' remaining claims for breach of contract and breach of the implied covenant of good faith and fair dealing. At the close of Tara Woods' case, the judge considered a motion pursuant to Fed. R. Civ. P. 52(c) and entered judgment in favor of Fannie Mae and EF&A.

## STANDARD OF REVIEW

Tara Woods challenges the dismissal of its breach of fiduciary duty claim, the application of the statute of limitations to dismiss the majority of its interference claim, and the adverse judgment on its breach of contract and associated implied covenant of good faith claim. We review de novo the dismissal of Tara Woods' breach of fiduciary duty and interference claims under Fed. R. Civ. P. 12(b)(6), accepting as true the complaint's well-pleaded factual allegations and viewing them in the light most favorable to the plaintiff. *Schrock v. Wyeth Inc.*, 727 F.3d 1273, 1280 (10th Cir. 2013). "To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain 'enough facts to state a claim to relief that is plausible on its face.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

Because Tara Woods' appeal concerning its contract claims is from a judgment in a bench trial pursuant to Fed. R. Civ. P. 52(c), we review findings of fact for clear error and legal conclusions de novo. *See Chavez v. City of Albuquerque*, 630 F.3d 1300, 1306 (10th Cir. 2011). "If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence

differently." *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 573–74 (1985). "The trial court's findings of fact will be upheld unless, after review, the appellate court is firmly convinced a mistake has been made." *Litwin v. United States*, 983 F.2d 997, 999 (10th Cir.1993). The parties agree Colorado law applies to Tara Woods' claims.

A.      Breach of Fiduciary Duty Arising from a Confidential Relationship

Tara Woods alleged Fannie Mae breached its fiduciary duty by demanding confidential information regarding the identity of Stone Creek's potential buyers and the progress of the sales negotiations, which it then used to communicate with one or more of these buyers regarding the need for repairs and Fannie Mae's intent to initiate foreclosure proceedings.[9] Tara Woods further alleged Fannie Mae misrepresented it would be cooperative during Tara Woods' attempts to complete the sale, but then used the confidential information to communicate with potential buyers to discourage Stone Creek's sale.

---

[9] Although Tara Woods alleges the information Fannie Mae demanded was not required by the contract, the Deed of Trust requires: "If an Event of Default has occurred and is continuing, Borrower shall deliver to Lender upon written demand all books and records relating to the Mortgaged Property or its operation." (Appellant's App'x Vol. I at 87, Section 14(e).) In turn, the definition of "Mortgaged Property" includes "all of Borrower's present and future right, title and interest in . . . all contracts, options and other agreements for the sale of the Land, the Improvements, the Fixtures . . . or any other part of the Mortgaged Property entered into by Borrower now or in the future, including cash or securities deposited to secure performance by parties of their obligations." (*Id*. at 76, Section 1(s)(8).) From these provisions, it appears Tara Woods was required, at least, to provide information regarding potential purchasers who made offers on the property.

The district judge concluded the amended complaint failed to allege sufficient facts to establish a fiduciary relationship. She reasoned the "bare assertion" of Fannie Mae's demand for information concerning the sale, "does not permit the Court to infer . . . [Fannie Mae] somehow manifested a willingness to thereafter act in [*Tara Woods'*] interests in discussing the potential sale of Stone Creek." *Tara Woods Ltd. P'ship v. Fannie Mae*, 731 F. Supp. 2d 1103, 1119 (D. Colo. 2010). And "the mere fact that [Fannie Mae] gave advice to [Tara Woods] or discussed strategies in how to best market and sell Stone Creek does not give rise to an inference that [Fannie Mae] intended to assume a fiduciary duty to act for [Tara Woods] in aiding in the sale of the property." *Id*. Because the amended complaint did "not plead facts from which [Fannie Mae's] intent to assume a fiduciary duty to [Tara Woods] concerning attempts to sell Stone Creek can be plausibly inferred," the claim was dismissed. *Id*.

Tara Woods complains of an "overly strict interpretation of the law of fiduciary duty" when the judge dismissed this claim on the pleadings. (Appellant Br. at 21.) It acknowledges that, "in the absence of special circumstances, the relationship between a lending institution and its customer is merely one of creditor and debtor," to which no fiduciary duty applies. *Premier Farm Credit, PCA v. W-Cattle, LLC*, 155 P.3d 504, 523 (Colo. App. 2006). It nevertheless asserts Fannie Mae's intent to assume a fiduciary relationship is unnecessary when the relationship itself defines a fiduciary duty, i.e., a "confidential relationship which . . . induces one party to relax the care and vigilance it

would ordinarily have exercised in dealing with a stranger." *Dolton v. Capitol Fed. Sav. & Loan Ass'n*, 642 P.2d 21, 23 (Colo. App. 1981) (quotation marks omitted). Because a fiduciary duty may occur where a special advisor/advisee relationship develops between the lender and borrower, *Wells Fargo Realty Advisors Funding Inc. v. Uioli, Inc.*, 872 P.2d 1359,1365 (Colo. App. 1994), Fannie Mae's acceptance of confidential information that could affect the value of the collateral created in Tara Woods' view, a "fiduciary duty not to use or disclose the confidential information concerning Tara Woods' sales efforts and prospective buyers in a manner detrimental to Tara Woods." (Appellant's Br. at 24.)

A breach of a fiduciary duty arising from a confidential relationship requires the plaintiff to show: (1) the "trust and confidence [placed] in the other party was justified, or the party in whom such confidence was reposed either invited, ostensibly accepted, or acquiesced in such trust; (2) the alleged trustee assumed a primary duty to represent the other party's interest in the subject of the transaction; (3) the nature and scope of the duty . . . extended to the subject matter of the suit; and (4) that duty was violated, resulting in damage to the party reposing such confidence." *Jarnagin v. Busby, Inc.*, 867 P.2d 63, 67 (Colo. App. 1993). Tara Woods relies on the Colorado Court of Appeals decision in *Rubenstein v. South Denver Nat'l Bank*, 762 P.2d 755 (Colo. App. 1988) where the court held there was a confidential relationship between the Bank's loan customers/depositors. The duty was breached when the Bank told one of the plaintiffs' employees that the

plaintiffs' line of credit would be cancelled and told one of the plaintiffs' customers that plaintiffs were in financial difficulty. *Id*. at 756. The court held: "In light of the considerable authority for the general rule that a bank is under a duty not to disclose the financial condition of its customers and depositors, we conclude that the trial court erred in entering summary judgment dismissing plaintiffs' claim for unauthorized disclosure of confidential information." *Id*. at 757. Tara Woods contends the situation here is similar. We do not agree.

First, every conceivable banking loan involves the transmission of some sort of confidential information. A lender's duty to protect such information cannot automatically create a fiduciary relationship as Tara Woods suggests; "there is no *per se* fiduciary duty between a borrower and a lender." *Wells Fargo Realty Advisors Funding, Inc.*, 872 P.2d at 1365. Moreover, *Rubenstein* can be easily distinguished. Unlike the situation here, where the confidential information is the identity of potential purchasers of the loan's security, *Rubenstein* addressed the unauthorized disclosure of *financial* information to a *third party*. And even if *Rubenstein* extended to the disclosure of information other than the borrower's financial information, "the lender's duty to refrain from involvement in transactions antagonistic to the borrower arises [only] *if a fiduciary relationship exists." Id.* Thus, Tara Woods must allege facts pre-dating the allegedly detrimental use of confidential information in order to effectively plead a fiduciary

- 13 -

relationship due to the confidence placed in another.[10]  It did not do so.[11]  The breach of

fiduciary duty claim was properly dismissed.[12]

B.    Statute of Limitation/ Interference with Prospective Business Advantage

Tara Woods' amended complaint alleged three instances of interference with

prospective business advantage; (1) filing a baseless foreclosure action; (2) secretly

---

[10] We do not say the disclosure of confidential information may not breach a contractual duty of good faith and fair dealing.  Our discussion is limited to the creation of a fiduciary relationship.

[11] Tara Woods alleged below that it was in a fiduciary relationship because Fannie Mae gave it advice on the management and sale of Stone Creek.  However, Tara Woods did not allege it took Fannie Mae's advice and the record indicates any such advice was ignored.

[12] Tara Woods faces a second difficulty with its claim.  As argued by Fannie Mae on appeal, even if we allowed Tara Woods to proceed, its breach of fiduciary duty claim would undoubtedly fail if subjected to a motion for summary judgment.   In its amended complaint, Tara Woods failed to mention no less than three notices of default Fannie Mae had sent before the alleged breach of fiduciary duty.  A fiduciary relationship does not arise when the parties are in an adverse position.  *See Wells Fargo Realty Advisors Funding, Inc.*, 872 P.2d at 1365 ("No fiduciary duty arises between a bank and its borrower where the bank did not offer financial advice, its advice was not always heeded, or where the borrower was advised by others, such as legal counsel.").
    Tara Woods tells us the parties were not in an adversarial posture until the foreclosure proceeding in November 2006 because, until then, "the parties maintained a cooperative relationship:  Fannie Mae and EF&A agreed to forbear from pursuing foreclosure in favor of working with Tara Woods to sell the property."  (Appellant's Reply Br. at 6.)  However, the February 16, 2006, (second) notice of default explicitly stated:  "While Fannie Mae understands that there is, perhaps, a potential sale of the Mortgaged Property . . . the borrower must comply with its obligations under the Loan Documents."  (Appellees' App'x Vol. I at 108.)  Tara Woods has offered no evidence showing Fannie Mae's requirement of continued compliance with the loan obligations to have been rescinded.  An agreement to cooperate by parties represented by counsel does not make the relationship any less adverse for purposes of determining whether a fiduciary duty exists.

- 14 -

communicating with prospective purchasers to discourage the sale; and (3) sending notice

of additional defaults after abandoning the foreclosure action. Fannie Mae moved to

dismiss the claims based on Colorado's two-year statute of limitations. *See* Colo. Rev.

Stat. § 13-80-102(1)(a). In response, Tara Woods claimed it could not have known it was

damaged until it sold the property for a reduced amount and therefore, its cause of action

did not accrue until the sale in May 2008.[13] The district judge rejected this argument.

Calculating two years back from the date Tara Woods filed its complaint in state court

(March 11, 2009), it dismissed the interference claim based on conduct occurring before

March 11, 2007. The interference claim based on actions taken after the withdrawal of

the foreclosure action was later dismissed on summary judgment and is not challenged

here.

On appeal, Tara Woods takes a different approach. It now contends its cause of

action could not have accrued until the date Fannie Mae withdrew the foreclosure,

arguing:

> At the time the foreclosure action was commenced, Tara Woods could not
> have known whether its opposition to the foreclosure action would succeed,
> nor could Tara Woods have predicted that the foreclosure action would be
> unilaterally withdrawn. If Fannie Mae had succeeded in foreclosing on the
> property, Tara Woods could not have suffered injury as a result of tortious

---

[13] According to Tara Woods, because the amended complaint does not state the date when it first knew or should have known of the injury and its cause, the limitations bar did not appear on the face of the complaint and the question is normally one of fact. *See Sterenbuch v. Gross*, 266 P.3d 428, 432 (Colo. App. 2011). The facts alleged in the complaint, however, were sufficiently detailed to determine Tara Woods knew of its injury by November 2006 at the latest.

interference with a future sale of Stone Creek for the simple reason that Tara Woods would have had no property to sell.

(Appellant's Br. at 16.)

"It is generally held that questions raised for the first time on appeal are not to be considered by an appellate court." *Stahmann Farms, Inc. v. United States*, 624 F.2d 958, 961 (10th Cir. 1980). Nonetheless, Tara Woods asks that we relax this rule because "the question is one of law and failure to hear it results in miscarriage of justice." *Id*. We decline this invitation as there is no miscarriage of justice here.

A claim accrues when "both the injury and its cause are known or should have been known by the exercise of reasonable diligence." Colo. Rev. Stat. § 13-80-108(1). "[O]nce *some* injury has occurred, the statute begins to run, notwithstanding that further injury continues to occur." *Duell v. United Bank of Pueblo, N.A.*, 892 P.2d 336, 340 (Colo. App. 1994). Where the fact of injury is known, uncertainty as to the extent of damages does not prevent the statute of limitations from running. *Dove v. Delgado*, 808 P.2d 1270, 1274 (Colo. 1991). Here, Tara Woods alleged interference due to Fannie Mae's communicated *intent* to foreclose on the property, and the *initiation* of a baseless foreclosure caused Tara Woods damage. Thus, as these injuries occurred prior to the time Fannie Mae withdrew the foreclosure action, "they did not remain uncertain or speculative pending the resolution of the [foreclosure] action." *Sterenbuch v. Gross*, 266 P.3d 428, 435 (Colo. App. 2011). The district court properly dismissed the interference claim as time-barred.

C.     Breach of Implied Covenant of Good Faith and Fair Dealing

Tara Woods argues Fannie Mae's demand for an additional $2.7 million in January 2007, based on the 2006 PNA, violated Fannie Mae's obligation to reasonably use its discretion in determining additional costs to keep the property in good order and to prevent deterioration of the property.[14]  Grossman testified to his expectations that he need only repair and maintain the property so that it remained in the same condition as it was in 1999.  The judge determined neither Grossman, nor Tara Woods' property manager from 2006 through 2008 had sufficient experience to testify as to the commercial reasonableness of Fannie Mae's demands.  She then compared the property condition reports from 2004 through the date of the sale of the property, and noted the reports consistently stated the property was not well-maintained and would need repair in amounts ranging "between $1 and $2.7 million."  (Appellant's App'x Vol. I at 267.)  Based on this evidence, she concluded Tara Woods failed to establish Fannie Mae's demand was commercially unreasonable.  Basically, Tara Woods argues this conclusion is clearly erroneous when the costs of repairs and replacements required in the 1999 and 2005 PNAs are compared to those required in the 2006 PNA (especially the cost for replacement of the boilers).

"Good faith performance of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party."

---

[14] Tara Woods does not appeal from the judgment on the remainder of its contract claims.

*Wells Fargo Realty Advisors, Inc.*, 872 P.2d at 1363. "The duty of good faith and fair dealing applies when one party has discretionary authority to determine certain terms of the contract, such as quantity, price, or time." *Amoco Oil Co. v. Ervin*, 908 P.2d 493, 498 (Colo. 1995). "When one party uses discretion conferred by the contract to act dishonestly or to act outside of accepted commercial practices to deprive the other party of the benefit of the contract, the contract is breached." *Wells Fargo Realty Advisors Funding, Inc.*, 872 P.2d at 1363. However, "good faith and fair dealing" does not impose an obligation contrary to terms or conditions for which a party has bargained. *Id.*

The parties agree Fannie Mae had the discretion to require additional payments if needed "to keep the Property in good order and repair . . . or to prevent the deterioration of the Property." (Appellant's App'x Vol. I at 118.) According to Tara Woods, the judge erroneously relied on Grossman's expectations and did not consider commercial reasonableness under an objective standard. The argument mischaracterizes the record.

The judge did not rely solely on Grossman's stated belief that he would only need to complete repairs according to the 1999 PNA. Indeed, she concluded Grossman and Tara Woods' property manager could not testify as to what was commercially reasonable due to their lack of experience in owning or managing large rental properties. Instead, she looked to other available evidence—not only the PNAs, but to other reports of inspections by third parties, such as those given to the potential buyers during due diligence and the report commissioned by Tara Woods prior to auction. As the judge noted, "[i]n 1999, the condition of Stone Creek was described as average and well-maintained" with an occupancy rate of 90 to 93%. (Appellant's App'x Vol. I at 266.) By

late 2006, the occupancy rate had dropped to the 40% range. The prior property management company left due to Tara Woods' failure to pay for standard maintenance costs. All of the property evaluations from 2004 through 2007 stated the property required significant repairs due to poor maintenance.

In every instance during 2005 and 2007, if a potential purchaser did not withdraw its offer completely, the due diligence resulted in a purchase price reduction of $2.75 million to $4.5 million. While the increase in the cost of boiler replacements between the 2005 PNA ($162,500.00) and the 2006 PNA (over $1 million) is surprising, we cannot say this difference leaves us with a definite and firm conviction that a mistake has been committed. *See Anderson*, 470 U.S. at 574 ("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous."). Under the terms of the agreement, the parties expected Tara Woods to keep the property maintained and gave Fannie Mae the discretion to determine the necessary costs of maintenance over the term of the loan. Tara Woods presented no evidence that Fannie Mae was commercially unreasonable in its demands.

AFFIRMED.

**Entered by the Court:**

**Terrence L. O'Brien**
United States Circuit Judge
