Harry LITWIN, Plaintiff–Appellee,

v.

UNITED STATES of America,
Defendant–Appellant.

No. 91–3208.

United States Court of Appeals,
Tenth Circuit.

Jan. 12, 1993.

**998**

Christine A. Grant (Shirley D. Peterson, Asst. Atty. Gen., Gary R. Allen and Jonathan S. Cohen, Tax Div., Dept. of Justice, Lee Thompson, U.S. Atty., of counsel, with her on the briefs), Washington, DC, for defendant-appellant.

Eric F. Melgren (Gerald Sawatsky of Foulston & Siefkin with him, on the briefs), Wichita, KS, for plaintiff-appellee.

Before BALDOCK and SETH, Circuit Judges, and BRIMMER *, District Judge.

BRIMMER, District Judge, sitting by designation.

### Background

Appellee Harry Litwin initially brought suit to recover income taxes and interest he allegedly overpaid for tax years 1983 and 1984. The district court held that Litwin was not liable for certain tax assessments and ordered appellant, the United States, to refund Litwin's overpayment. The issue before this Court is whether, under the "clearly erroneous" standard of review, the evidence supports the trial court's finding that Litwin was entitled to deduct his losses and expenses from ordinary income in tax years 1983 and 1984.

Litwin is a process engineer and businessperson in the field of petroleum refining who, up until 1980, had been successfully involved in a number of energy-related start-up companies. For example, in 1974, Litwin retired from his own highly successful Litwin Corporation. Between 1974 and 1980, Litwin fathered two additional businesses which profited.

In 1980, Litwin founded Advanced Fuel Systems ("AFS"). The purpose of AFS was to provide and install alternative fuel systems, such as compressed natural gas or propane, for motor vehicles. Litwin was the principal shareholder of AFS and the principal investor. He was also chairman of the board as well as the company's chief executive officer.

For various economic reasons, AFS experienced cash flow problems from 1980 to 1983. During this period, Litwin directly lent the corporation money and personally guaranteed loans made by a third-party bank to AFS. Subsequently, AFS filed for Chapter 11 reorganization in late 1983 (later converted to a Chapter 7 liquidating

---

* The Honorable Clarence A. Brimmer, District Judge, United States District Court for the District of Wyoming, sitting by designation.

bankruptcy). As a result, Litwin incurred five tax-related losses. First, Litwin lost $150,000 in monies he personally loaned to AFS in 1982 and 1983. Second, in early 1984, Litwin had to pay $350,000 to the Fourth National Bank and Trust Company pursuant to his individual status as guarantor on loans made by the bank to AFS. Third, Litwin incurred $75,097 in legal fees in a suit to collect against other loan guarantors. Fourth, Litwin incurred $33,577.08 in legal fees defending a counterclaim against Nu–Power, an AFS distributor. Fifth and finally, in 1984, Litwin lost an advance of $10,000 made to an independent marketing representative.

Litwin claimed business bad debt deductions for all five losses on his 1984 tax return. The Commissioner disallowed the $75,097 in full, disallowed $7,850 of the $33,577.08, and recharacterized the other claimed business bad debt deductions as nonbusiness in nature. As a result, Litwin was allowed to take only short-term capital loss deductions, severely limiting use of the deductions for carryback purposes.

Litwin paid assessments on his tax deficiencies asserted for the 1983 and 1984 tax years, then filed claims for a refund for those years pursuant to Internal Revenue Code (I.R.C.) § 166(a) (business bad debts) and I.R.C. § 162 (business expense). The claims were denied, except for the Nu–Power litigation claim, of which $25,727 was allowed and $7,850 disallowed. Litwin filed this suit seeking a full refund.

After a bench trial, the trial court determined that the transactions at issue had "a business purpose" and, therefore, Litwin was not liable for the assessments. The trial court ordered a refund of $42,761 for 1983 and $11,469 for 1984.

The government appeals from these findings arguing that (1) relevant case law states that objective facts, not taxpayer's subjective intent, control characterization of the loans and expenses at issue; and, thus, the trial court erred by not applying the objective test set forth in the relevant case law; (2) the trial court erred in allowing taxpayer to deduct as a business bad debt legal fees paid in connection with the defense of a suit brought by a former distributor of AFS because taxpayer failed to carry his burden of proof that the legal fees were a debt that became worthless; and finally, (3) the trial court erred as a matter of law when it alternatively held that taxpayer was entitled to deduct the losses at issue as ordinary and necessary business expenses incurred to protect his business reputation.

### Standard of Review

■ The "clearly erroneous" standard of review applies. Federal Rule of Civil Procedure, Rule 52(a) provides that "Findings of fact ... shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." The trial court's findings of fact will be upheld unless, after review, the appellate court is firmly convinced a mistake has been made. *See e.g., Las Vegas Ice & Cold Storage Co. v. Far West Bank*, 893 F.2d 1182, 1185 (10th Cir.1990) (quoting *LeMaire ex rel. LeMaire v. United States*, 826 F.2d 949, 953 (10th Cir.1987)).

### Discussion

■ Internal Revenue Code, Section 166(a) provides that any debt may be deducted in the year in which it becomes worthless. Section 166(d) is an exception to this rule which provides that "nonbusiness debts" may not be so deducted; a "nonbusiness debt" is a debt which was not created or acquired in connection with a trade or business of the taxpayer. Treasury Regulation § 1.166–5(b) requires that in order for a taxpayer to deduct losses as a business bad debt, the taxpayer must show that the bad debt loss is "proximately related" to the conduct of trade or business, or that the debt was created in the course of trade or business.

■ The test for deciding whether a transaction is proximately related to trade or business is found in the case of *United States v. Generes*, 405 U.S. 93, 92 S.Ct. 827, 31 L.Ed.2d 62 (1972). In *Generes*, the Supreme Court held that, where taxpayer is both an employee and shareholder, the

taxpayer's "dominant motivation" underlying the transaction(s) at issue determines whether the transaction(s) is proximately related to taxpayer's trade or business. In the event a taxpayer's dominant motivation is business-related, the taxpayer may deduct. Oppositely, if taxpayer's dominant motivation is investment-related, the taxpayer may not deduct. Thus, whether a bad debt may be properly characterized as deductible is necessarily an issue for the trier of fact. 405 U.S. at 104, 92 S.Ct. at 833.

In holding as it did, the *Generes* court acknowledged that an employee-shareholder often acts with two motivations when making loans to his company. *Id.* at 100–02, 92 S.Ct. at 831–32. On one hand, the employee-shareholder desires to protect his investment; on the other hand, he desires to protect his status as employee. Only under the latter may a taxpayer deduct bad debt loss.

■ The most recent case of import to apply the *Generes* standard is *Kelson v. United States*, 503 F.2d 1291 (10th Cir. 1974). In *Kelson*, the Court held that "objective facts surrounding loans, rather than the [taxpayer's] subjective intent, control." 503 F.2d at 1293. Since *Kelson*, courts appear to have focused on three objective factors in determining a taxpayer's dominant motivation: (1) the size of taxpayer's investment, (2) the size of taxpayer's after-tax salary, and (3) other sources of gross income available to the taxpayer. *See e.g., Generes*, 405 U.S. at 110–11, 92 S.Ct. at 836–37 (Marshall, J. concurring); *Adelson v. United States*, 737 F.2d 1569, 1573–74 (Fed.Cir.1984); *Shinefeld v. Commissioner*, 65 T.C. 1092, 1096–97 (1976); *see also* James D. Angus, Jr., *Bad Debts: How To Establish the Three Factors Needed for A Full Deduction*, 14 Tax'n for Law. 110, 112–16 (1985) (author cogently discusses problems of mixed motives inherent in loans made by employee-shareholders to their respective corporations) (cited in WESTLAW as "14 TXNLAW 110"). It also appears that a court is more likely to find that a taxpayer made a non-deductible loan (i.e., one "dominated" by the non-business motive of protecting an investment) where the taxpayer's investment is relatively large, the taxpayer's salary is relatively small, and the taxpayer's other sources of income are relatively large. *Smith v. Commissioner*, 60 T.C. 316, 319–20 (1973); Martin M. Weinstein & James J. Doheny, Mertens Law of Federal Income Tax, § 30.50 (1982) (searched on WEST-LAW as "Mertens s 30.50").

■ Given the law as outlined above, we hold that the trial court had before it substantial objective evidence which indicated that Litwin's transactions were motivated by business purposes. First, evidence indicated that Litwin formed AFS principally to be employed, to earn a salary, and to remain useful to society. Litwin, his banker, his accountant, and his long-time friend and co-investor in AFS all testified that Litwin desired a salaried income and wanted and needed to remain active in the company. Litwin had a history of putting his efforts and resources into start-up companies which he would continue to assist after start-up. The trial court found that Litwin may have had several purposes in mind when starting AFS; but, that a person of Litwin's background and advanced age could reasonably conclude that his best chance for ongoing employment lay with a company he devised. Though not dispositive of objective motive, the trial court properly factored into its analysis Litwin's personal desire to work, provide a useful service, and benefit society.

Second, Litwin spent a large portion of his time working with and for AFS. For example, in April 1983, after AFS stock was privately sold to four investors (in exchange for a promissory note which was never paid), Litwin remained on as chief executive officer and board chairman, spending the majority of his time and energy managing AFS' business affairs. After the sale of his controlling interest, Litwin had little chance to obtain significant capital returns on his investment in AFS. These facts stand in stark contrast to the taxpayers in *Generes* and *Kelson* who spent relatively small portions of their time with their respective corporations. *See*

*Generes,* 405 U.S. at 110–111, 92 S.Ct. at 836–37 (Marshall, J., concurring); *Kelson,* 503 F.2d at 1294.

■ Third, although Litwin deferred his salary for three years, evidence indicated that he intended to draw a salary in the future.[1] Litwin's salary was never paid during AFS' three years of operations for various reasons, though none of these reasons strongly suggest that Litwin desired to immediately maximize his short-term investment in the company.[2] Litwin deferred his salary, loaned AFS money directly, and personally guaranteed the corporation's line of credit in an effort to alleviate the company's cash flow problems.

■ Fourth, Litwin took a rather sizeable risk when he personally guaranteed loans which far exceeded the value of his investment.[3] The trial court properly found that this fact suggested another motive beside investment. A taxpayer is probably not attempting to protect his investment in a company when the taxpayer personally guarantees loans to that company and those loans "far exceed" the value of the taxpayer's investment. *See e.g., Estate of Allen v. Commissioner,* 44 T.C.M. (CCH) 9, 17 (1982).

■ Furthermore, we agree with the district court that "courts have not reduced the holding in *Generes* to a simple, mathematical calculation." *Litwin v. United States,* No. 89–1072–C, 1991 WL 75945, at *6 (D.Kan. April 11, 1991). Nor does *Generes* rule out the possibility that a taxpayer may have an employment-related motive for making a loan even though the potential returns on the loan may increase the taxpayer's investment rather than the taxpayer's salary. *Id.*

In light of these facts, we conclude that the trial court was not clearly erroneous in

1. We note that, while deferred salary is one factor in the motive analysis, deferred salary unto itself is not dispositive of taxpayer's dominant investment motive. *See e.g., Carter v. Commissioner,* 39 T.C.M. (CCH) 456, 459–60 (1979) (taxpayer's deferred salary not dispositive of non-business motive).

2. The trial court concluded that "[a]t best, AFS was a long-term investment with its profitability

concluding that Litwin's testimony was not "self-serving," *Kelson,* 503 F.2d at 1293; and that, given all the evidence, Litwin's dominant motivation under § 166(a) was business, not investment, related. We thus affirm the trial court's holding that Litwin's bad debt losses and other expenses were deducted properly pursuant to I.R.C. § 166(a). We find it unnecessary to address whether Litwin's bad debts were deductible under I.R.C. § 162(a) or whether Litwin's professional and legal fees were ordinary and necessary business expenses made to protect and preserve his business reputation. As a result, we neither affirm nor reverse the trial court to the extent it alternatively discussed the deductibility of § 162(a) ordinary and necessary business expenses in connection with Litwin's business reputation.

AFFIRMED.

dependent upon the public coming to accept and use this alternative fuel source."

3. The trial court found that Litwin's loans, guarantees and advances to AFS were more than three times greater than the value of his investment. *Litwin v. United States,* No. 89–1072–C, 1991 WL 75945, at *6 (D.Kan. April 11, 1991).