ROBERT D. SCHMIDT AND LUCILLE P. SCHMIDT, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Schmidt v. Commissioner
Docket No. 28514-90
United States Tax Court
T.C. Memo 1993-506; 1993 Tax Ct. Memo LEXIS 516; 66 T.C.M. (CCH) 1187; November 2, 1993, Filed *516 A decision will be entered for respondent as to the income tax deficiencies and foir petitioners conceerning the addition to tax. For petitioners: Kevin M. Klemz. For respondent: James E. Schacht. GERBER
GERBER
MEMORANDUM FINDINGS OF FACT AND OPINION GERBER, Judge: Respondent determined deficiencies in petitioners' 1986 and 1987 Federal income tax in the amounts of $ 45,387.20 and $ 108,425.56, respectively. Respondent also determined additions to tax under section 6653(a)(1)(A)[1] in the amounts of $ 2,269.36 and $ 5,421.28 for 1986 and 1987, respectively, and 50 percent of the interest due on the deficiency as redetermined in each year under section 6653(a)(1)(B). The issues for our consideration are: (1) Whether petitioners' loans to the family farming operation became business or nonbusiness bad debts within the meaning of section 166(a) and (d); and (2) whether petitioners are liable for additions to tax for negligence under section 6653(a)(1)(A) and (B). *517 FINDINGS OF FACT The parties' stipulation of facts is incorporated herein by this reference. Petitioners had their legal residence at Edina, Minnesota, at the time of the filing of their petition in this case. Petitioner, Robert D. Schmidt (petitioner) was the active participant in the transactions under consideration and petitioner, Lucille P. Schmidt is a party to this proceeding because she filed joint returns of income for 1986 and 1987. During 1969, petitioner and his son formed a partnership to operate a farming business. That same year the partnership purchased two parcels of land totaling nearly 750 acres. Subsequently, other family members and petitioner's son-in-law and brother-in-law became involved in the partnership and/or the farm. All of the partnership's assets and liabilities were contributed to Tal Bauernhof, Inc. (TBI), a corporation formed during 1973. TBI was formed to avoid Minnesota usury laws in connection with the borrowing of funds from Travelers Insurance Co. (Travelers) to purchase farmland. TBI was operated as a family-owned farm the shares of which were owned by petitioner, his three children, and two in-laws. With the exception of petitioners *518 and a few other family members, petitioner's family and in-laws worked full time at the TBI farm. Additionally, other than petitioners, family members lived year-round in residences on the farm. In the mid-1970s petitioner's son became the general manager of the TBI farm operations. Petitioner owned as much as 96.5 percent of TBI's shares of stock and, during 1979 through 1984, petitioner owned approximately 70 percent of TBI's shares. TBI's Federal tax status, at least through 1985, was that of an S corporation. For a period of about 1-1/2 years, in an attempt to equalize stock ownership, shareholders, other than petitioner, contributed $ 100 of their $ 400 monthly salary to purchase shares in TBI. Subsequently, petitioner gifted some of his TBI shares to his children. At the time petitioner became involved in the farming activity, he was already employed full time as an executive of Control Data Corp. (CDC). He envisioned living and working at the farm after retirement or termination from his then full time employment. Petitioner considered his involvement in TBI to be similar to a pension plan and, in part, became involved with farming due to his concern about his future *519 at CDC. He began his employment with CDC as a salesman in 1959 and moved through successively more responsible positions. Late in the 1970s and early 1980s petitioner was one of the top three or four executives of CDC and vice chairman of the board of directors. Petitioner's salary from CDC during 1986 and 1987 exceeded $ 150,000, without considering any other benefits. Petitioner was president of TBI and his duties included: routine farm work such as feeding cattle, breeding and calving, working in the pig barn; and general management duties including financial planning, cash-flow analysis, and preparation of minute books. The farm was about a 1-hour drive from petitioner's home and he tried to spend about 20 hours per week at the farm. During the mid-1970s, however, petitioner was engaged in more travel outside this country in connection with his responsibilities at CDC. Unlike the full-time employees of TBI who each received $ 400 per month, petitioner did not receive any salary from the partnership or TBI during or prior to the years in issue. Although petitioner considered his involvement in TBI as leading to a pension or retirement-type activity, he did not draw a salary *520 from TBI until 1991, some 4 years after his retirement from CDC, or from activities related to CDC. TBI had cash-flow problems, which in part were attributable to expansion and the purchase of capital goods. During the late 1970's and early 1980's petitioner contributed most of his CDC bonuses to TBI. Most of those contributions were used to pay the principal on TBI's loans, which bore interest at rates from 21 to 24 percent. By 1981, petitioner's capital contributions to TBI totaled about $ 1.8 million. During 1981 and 1982, TBI was unsuccessful in obtaining additional financing from banks or insurance companies and petitioner personally loaned $ 465,000 and $ 302,800, respectively, to TBI. The loans were evidenced by interest-bearing (prime plus 1.5 percent) demand notes. The loan proceeds were used by TBI for operating costs, livestock purchases, and capital improvements. It was expected that these loans would be repaid in about 3 years. In addition to the loans, petitioner contributed about $ 900,000 of additional capital to TBI during and after making the loans in question. In January 1986 the mortgage with Travelers became due. After refusing to rollover the mortgage, *521 Travelers began foreclosure of TBI's properties. Although the foreclosure proceeding was resisted, the foreclosure proceeded and TBI eventually was farming land owned by Travelers. At some point after the foreclosure, petitioner and his family reacquired ownership of the farm. Petitioner's loans to TBI in the amounts of $ 285,735 and $ 310,790 became worthless during 1986 and 1987, respectively, and were deducted by petitioners as "Other expenses" on petitioners' Schedules F (Farm Income and Expenses) filed with their joint returns. In schedules attached to the 1986 and 1987 returns petitioners specifically and clearly characterized the "Other expenses" as "business bad debts" with thorough descriptions of the circumstances. Petitioners' returns, since 1969 and including 1986 and 1987, were prepared by a professional tax preparer. Petitioners relied upon the tax preparer. Respondent, in the notice of deficiency, disallowed the deductions as business bad debts and determined that the deductions were nonbusiness bad debts. ULTIMATE FINDINGS OF FACT Petitioner was not engaged in the trade or business of being an employee of TBI during the years in question and his dominant motivation *522 for making the loans to TBI was not related to a trade or business activity of petitioner. OPINION We consider the question of whether petitioner's loans, which became worthless, are business or nonbusiness bad debts under section 166. Under section 166(a), a debt is deductible in the year it becomes worthless. There is no dispute here that $ 285,735 and $ 310,790 in debts due from TBI to petitioner became worthless during 1986 and 1987, respectively. A nonbusiness debt is defined in section 166(d)(2) as a debt other than one created or acquired in connection with a trade or business of the taxpayer or the loss from the worthlessness of which is incurred in the taxpayer's trade or business. However, under section 166(d)(1)(B), a worthless nonbusiness bad debt is deductible only as a short-term capital loss. Whether a debt is characterized business or nonbusiness is a question of fact. Section 1.166-5(b)(2), Income Tax Regs. The burden is on petitioner to prove that he was engaged in a trade or business, and that his worthless loans constituted business, rather than nonbusiness bad debts. Rule 142(a); United States v. Generes, 405 U.S. 93, 104 (1972); *523 Whipple v. Commissioner, 373 U.S. 193, 202 (1963). Being an employee may constitute a trade or business which could provide the link between the debt and business activity. Putoma Corp. v. Commissioner, 66 T.C. 652, 673 (1976), affd. 601 F.2d 734 (5th Cir. 1979). Accordingly, we must consider whether petitioner was an employee of TBI. Although many members of petitioner's family were full-time employees of TBI who were paid $ 400 per month, petitioner's activities with TBI were not those of an employee. Petitioner's time available for TBI would only be the spare time he may have had after fulfilling his officer/employee responsibilities to CDC. Just prior to and during the time the loans were made, petitioner's obligations to CDC were substantial and involved international sales and travel outside of the country. He was not paid a salary and no salary accrued as a liability on the books of TBI. His activities at TBI were directed more toward protecting his financial involvement or investment in the enterprise. It was petitioner's intent to become involved as an employee of TBI after his *524 retirement or termination from CDC, but that did not occur until after the debt in question became worthless (1986-87). No wage or salary was paid to, or accrued on behalf of, petitioner from TBI until sometime in 1991. Petitioner argues that his failure to receive a salary is not determinative of his status as an employee of TBI. Petitioner also argues that it would have been a useless act to pay himself a salary because he would have simply paid it back into the corporation to reduce the cash-flow shortages. Under the circumstances here, we find petitioner's argument unpersuasive. The Supreme Court has pointed out that: Devoting one's time and energies to the affairs of a corporation is not of itself, and without more, a trade or business of the person so engaged. Though such activities may produce income, profit or gain in the form of dividends or enhancement in the value of an investment, this return is distinctive to the process of investing and is generated by the successful operation of the corporation's business as distinguished from the trade or business of the taxpayer himself. * * * [Whipple v. Commissioner, supra at 202.]
*525 The very nature of petitioner's relationship to TBI was to provide capital to finance its operations and acquisitions of assets. At the time of the loans, he had invested $ 1.8 million in TBI and another $ 900,000 was invested after making the loans in question. Essentially, petitioner was attempting to establish an operating family farm to which he intended to devote his time after retiring from CDC. He did not perform as an employee in the ordinary sense, but helped out when it did not conflict with his responsibilities to CDC. Petitioner's posture with respect to TBI was that of an investor, wherein he held as much as 96 percent and never less than one-half of the outstanding shares of stock. The fact that petitioner someday planned for his retirement, or possible termination from CDC, by being involved and/or employed by TBI is not the type of activity which rises to the level of a trade or business that renders the bad debts deductible as business bad debts for the years in issue. Under the circumstances we hold that petitioner was not an employee of TBI. Even if we held petitioner were an employee of TBI, he has not shown that the loans were "necessary to keep his job *526 or * * * [were] otherwise proximately related to maintaining his trade or business as an employee." Whipple v. Commissioner, 373 U.S. at 204. Moreover, this record reflects that protecting his investment was petitioner's dominant motive for making the loans. See United States v. Generes, 405 U.S. at 103, where the Supreme Court in adopting the test from Whipple v. Commissioner, supra, commented: We conclude that in determining whether a bad debt has a "proximate" relation to the taxpayer's trade or business, as the Regulations specify, and thus qualifies as a business bad debt, the proper measure is that of dominant motivation, and that only significant motivation is not sufficient. * * *
Even if petitioner had received the same $ 400 monthly salary as other full-time employed family members, considering the size of the loans, that fact would not demonstrate that petitioner's dominant motivation was to protect his trade or business as an employee. The facts here reflect that his dominant or primary motive was to protect his capital investment. Petitioner cited several Memorandum *527 Opinions of this Court in support of his position. [2] We find those cases are factually distinguishable from the facts of this case. Petitioner also cited Litwin v. United States, 67 AFTR 2d 91-1098, 91-1 USTC par. 50,229 (D. Kan. 1991), affd. 983 F.2d 997 (10th Cir. 1993) as being factually on point. The Court of Appeals in Litwin referenced Kelson v. United States, 503 F.2d 1291 (10th Cir. 1974) noting that the court's focus was upon the objective facts surrounding the loans, rather than the taxpayer's subjective intent. The factors considered in Kelson were (1) the size of the taxpayer's investment, (2) the size of the taxpayer's after-tax salary, and (3) other sources of gross income available to the taxpayer. Considering those factors in this case, petitioner's dominant motivation was his investment with the ultimate objective of facilitating a farming business for his family members. *528 In Litwin the taxpayer was an entrepreneur who had been successful in a number of energy-related startup companies. Upon retirement from one of his highly successful corporations, he began two other successful businesses. Thereafter, he began the business in question which was also in an energy-related industry. The taxpayer was the sole shareholder, board member, and chief executive officer. Also the taxpayer spent a large amount of his time working for the company to which he loaned money and he had expectations of earning a salary, even though he deferred his salary for 3 years to maximize his short-term investment. Finally, the taxpayer sold his controlling stock or investment interest to four investors prior to the claim of worthlessness. The only comparable fact between Litwin and this case is the failure to pay salary during the years for which the deduction was claimed. Mr. Litwin's objective goals and intent, however, were far different from petitioner's. Mr. Litwin was a successful promoter of energy-related businesses, whereas petitioner is in computer sales and was involved in financing a family farm. Petitioner had a long-term goal of retiring to the *529 farm, whereas Mr. Litwin was currently seeking employment for immediate gain. Moreover, in Litwin the annual salary was set at $ 30,000 though deferred for 3 years, whereas here petitioner was not an employee, but apparently intended to someday become one and neither took nor deferred a salary. More importantly, the level of the salaries involved here, of $ 400 per month in the case of other family members, contradict the possibility that petitioner made the loans to protect his trade or business as an employee. Therefore, we hold that petitioner's loans to TBI, which became worthless, are nonbusiness bad debts within the meaning of section 166(a). Finally, we consider whether petitioners are liable for additions to tax under section 6653(a)(1)(A) and (B). Section 6653(a)(1)(A) provides for a 5-percent addition to tax if any part of the underpayment is due to negligence or intentional disregard of the rules or regulations. If section 6653(a)(1)(A) is applicable for the 1986 and/or 1987 taxable years, then section 6653(a)(1)(B) provides for a further addition equal to 50 percent of the interest attributable to that portion of the underpayment resulting from negligence or *530 intentional disregard of the rules or regulations. Negligence is defined as lack of due care or failure to do what a reasonable and prudent person would do under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947-948 (1985). Petitioners bear the burden of proof on this issue. Bixby v. Commissioner, 58 T.C. 757, 791-792 (1972). Here, petitioners claimed a deduction for a business bad debt which respondent agrees was worthless for the years reported by petitioners. The only disagreement was the characterization of the loss as business or nonbusiness for purposes of section 166. That controversy is almost exclusively a factual one, and we do not find petitioners, who relied upon a tax preparer for many years and also included a clear and complete statement of their claimed deduction on each return, to be negligent. To reflect the foregoing, A decision will be entered for respondent as to the income tax deficiencies and for petitioners concerning the addition to tax.
Footnotes
1. Section references are to the Internal Revenue Code in effect for the taxable years under consideration. Rule references are to this Court's Rules of Practice and Procedure.↩
2. Miller v. Commissioner, T.C. Memo. 1984-448; Allen v. Commissioner, T.C. Memo. 1982-303; Goodenough v. Commissioner, T.C. Memo. 1980-28; Carter v. Commissioner, T.C. Memo. 1979-447↩.