**Headnote:** *Comptroller of the Treasury v. Wais Jalali, et al.*, No. 1671, Sept. Term, 2016, Opinion by Kenney, J.

**ADMINISTRATIVE LAW – STANDARD OF REVIEW – SUBSTANTIAL EVIDENCE – MARYLAND TAX COURT –** In judicial review of a decision of the Maryland Tax Court, the appellate court is limited to determining whether there is substantial evidence in the record as a whole to support the agency's findings of fact, and whether the administrative decision is premised upon an erroneous conclusion of law. In applying the substantial evidence test, the reviewing court decides whether a reasoning mind reasonably could have reached the factual conclusion that the Tax Court reached.

**ADMINISTRATIVE LAW – STANDARD OF REVIEW – MIXED QUESTION OF LAW AND FACT – "DEBT-EQUITY" QUESTION –** The "debt-equity" question—whether monetary advances to a business constitute debt or equity—is a mixed question of law and fact that the appellate court reviews for substantial evidence.

**INTERNAL REVENUE CODE – NATURE AND EXISTENCE OF DEBT** – To establish whether a bad debt qualifies for a bad debt deduction under 26 U.S.C. § 166(a), a taxpayer must prove a genuine intention to create debt, with reasonable expectation of repayment, that is consistent with the economic reality of creating a debtor-creditor relationship.

**ADMINISTRATIVE LAW – PRESERVATION OF QUESTIONS BEFORE ADMINISTRATIVE AGENCY** – Ordinarily, a court reviewing the decision of an administrative agency may not pass upon issues presented for the first time on judicial review.

Circuit Court for Anne Arundel County
Case No. C-02-CV-16-000846

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1671

September Term, 2016

_____

COMPTROLLER OF THE TREASURY

v.

WAIS JALALI, *et al.*

_____

Meredith,
Shaw Geter,
Kenney, James A., III
  (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Kenney, J.

_____

Filed:  January 31, 2018

This case concerns monetary advances made by a taxpayer to businesses that he owned or in which he had an ownership interest. Appellees, Wais Jalali and Mena Jalali ("the Jalalis"), claimed that the advances were bona fide loans that were not repaid, and sought to deduct them as unreimbursed business bad debts. The Comptroller of the Treasury, appellant, rejected appellees' claim. When the Maryland Tax Court agreed with the Jalalis and reversed the Comptroller's determination, the Comptroller sought judicial review in the Circuit Court for Anne Arundel County, which affirmed the Tax Court. The Comptroller, now seeking judicial review in this Court, presents a single question, which based on the arguments in its brief, we have rephrased as two:[1]

1. Did the Tax Court err in determining that the advances were bona fide loans and therefore, business bad debt, which is deductible as an unreimbursed business expense?

2. Even if the advances were debt, were they non-deductible because they were "non-business bad debt" due to Mr. Jalali being an investor, not an employee, of the companies?

For the reasons that follow, we shall affirm the judgment of the circuit court.

---

[1] Appellant's brief presented the following question:

Did the Tax Court err in finding that $3,799,000 in cash advances that Mr. Jalali made to his controlled corporations were deductible as unreimbursed employee business expenses?

The argument was subdivided as follows:

1. The Tax Court Did Not Properly Evaluate Whether Mr. Jalali's Cash Advances Were Bona Fide Loans or Capital Contributions.

2. Even If the Advances Were Properly Determined to Be Debt, the Manner of Deduction Is Improper.

## FACTUAL AND PROCEDURAL BACKGROUND

Mr. Jalali and the companies to which he advanced money were in the business of the sales, manufacture, and installation of large commercial heating, ventilation, and air conditioning systems ("HVAC"); the customers were businesses and government entities. The business was carried on through several affiliated companies. The three companies relevant to this case were WDJ Capital Holdings, Inc. ("WDJ"), M&I Air Systems Engineering West, Inc. ("M&I"), and Potomac Environmental Technologies, Inc. ("PEPTEC").

WDJ, which was incorporated in 2006, was a holding company for three other companies, one of which was PEPTEC. PEPTEC was engaged in the sales of HVAC systems on the East Coast. Mr. Jalali, who was PEPTEC's CEO, owned 86% of WDJ. He began working as an engineer for PEPTEC in 1993, and around 2004 or 2005 he and two other individuals purchased the company. M&I, incorporated in 2008, manufactured HVAC units. Mr. Jalali was the sole shareholder of M&I.

Over the years, the companies did "really well." PEPTEC grew from a million-dollar-a-year company to a multi-million-dollar-a-year company. WDJ's revenue was almost $27 million and, in 2008, its net income totaled over $5 million. In October 2008, PEPTEC received a $3 million line of credit from Provident Bank,[2] to which it had full access until February or March 2010. M&I, in December 2009, entered into a $1 million factoring agreement with Advance Payroll Funding Ltd. to borrow on its account receivables.

---

[2] Provident Bank was later acquired by M&T Bank.

In 2008, PEPTEC won three bids to provide HVAC systems to the Johns Hopkins Cancer Research Center, the National Geospatial Agency, and Aberdeen Proving Ground (the "Three Projects"). If successfully completed, those projects would generate $30 million in income. The Three Projects, however, were larger than any previous projects handled by PEPTEC, and created, in the words of the Tax Court, the "perfect storm."[3]

The need to manufacture and deliver on all of the projects within the same time-frame resulted in major cash flow problems for the involved companies. It was to meet those delivery demands that Mr. Jalali contends that he made eighteen monetary advances to M&I between January 2009 and December 2009 totaling $1,799,000 and one advance to WDJ in December 2009 in the amount of $2,000,000.

Each advance was documented by a written promissory note that stated a "loan amount," "loan period," "interest rate," and other repayment terms. The M&I notes stated a 30-day fixed maturity date and 5% interest rate. One of the M&I notes, in the amount of $133,000, was repaid without adherence to the interest or repayment date terms.[4] The WDJ note was dated December 29, 2009 and provided for an 18-month term and 5% interest rate; it was not repaid. None of the notes were secured.

Mr. Jalali testified to a history of prior lending between himself and the companies during 2008 and 2009. No previously paid notes or copies were offered into evidence,

---

[3] Mr. Jalali testified that previously they would receive, at most, one project per year that was as large as one of the Three Projects.

[4] This promissory note was dated January 13, 2009 and provided for a 5% interest rate and 30-day loan period. It was stamped "PAID 5/21/09".

but the corporate books and bank records reflected previous repaid loans from Mr. Jalali to the companies.

The Three Projects were ultimately completed, but the companies did not survive the storm. Costly delays, mechanical problems with the systems, and a lawsuit by one of the project customers resulted in financial doom. For the tax year 2009, WDJ reported a loss of about $2.4 million and M&I reported a loss of about $2 million. M&I went out of business in December 2009. In 2010, PEPTEC ceased operations, and WDJ and its subsidiaries filed for bankruptcy.

In 2010, the Jalalis filed amended joint tax returns with the Maryland Revenue Administration Division and the Internal Revenue Service (IRS) for the tax years 2008 and 2009. Claiming the unpaid advances as unreimbursed business expenses, the amended returns sought a carried-back net operating loss (NOL) of $3,799,000 and requested refunds of $141,211 for tax year 2008 and $67,132 for tax year 2009.

When the Comptroller rejected the amended returns, the Jalalis requested a hearing under § 13-904 of the Tax - General Article[5] prior to a final determination on their claim. The hearing was conducted on March 13, 2014, and on June 3, 2014, the Comptroller issued a Notice of Final Determination. The refunds were denied, in part,

---

[5] (a) The tax collector shall:
(1) investigate each claim for refund; and
(2) conduct a hearing at the request of the claimant prior to a final determination on the claim.
(b) The tax collector shall give the claimant notice of:
(1) the determination of the claim for refund; and
(2) any delay in paying an allowed claim.

because proof of acceptance of the 2008 return by the IRS had not been provided, and because the Comptroller concluded that the advances were not bona fide loans.

The Jalalis appealed to the Maryland Tax Court, which held a hearing on January 28, 2016.[6] Following the hearing, the Tax Court reversed the Comptroller's determination and granted the refunds. The Comptroller filed a petition for judicial review in the Circuit Court of Anne Arundel County. The circuit court affirmed the Tax Court's decision in an Order dated September 8, 2016, and the Comptroller filed a timely notice of appeal.

## STANDARD OF REVIEW

As an administrative agency, the Tax Court's final order is subject to judicial review by this Court as provided in §§ 10-222 and 10-223 of the State Government Article. *Supervisor of Assessments of Anne Arundel Cty. v. Hartge Yacht Yard, Inc.*, 379 Md. 452, 460-61 (2004). Our inquiry on review "is not whether the circuit court erred, but rather whether the administrative agency erred." *Classics Chicago, Inc. v. Comptroller*, 189 Md. App. 695, 705 (2010) (quoting *Comptroller v. Clise Coal, Inc.*, 173 Md. App. 689, 697 (2007)).

An appeal to the Tax Court is heard de novo and conducted in a manner similar to a proceeding in a court of general jurisdiction sitting without a jury. Md. Code Ann. (1988, 2016 Repl. Vol.), Tax - General § 13-523. A taxpayer appealing the Comptroller's determination has the burden to show error in the Comptroller's

---

[6] By this time, the IRS had determined that the NOL was deductible and had issued a refund.

5

determination. Tax - General § 13-411; *see Frey v. Comptroller*, 422 Md. 111, 186 (2011).

We review the Tax Court's findings of fact to determine whether there is substantial evidence in the record as a whole to support its findings. *See, e.g., Gore Enterprise Holdings, Inc. v. Comptroller*, 437 Md. 492, 504 (2014). If "a reasoning mind reasonably could have reached the factual conclusion that the [Tax Court] reached," the factual finding must be upheld. 422 Md. at 137. And, when the interpretation of tax law involves mixed questions of law and fact, we review the Tax Court's determination for substantial evidence. *See Gore*, 437 Md. at 504; *Schwartz v. Dep't of Nat. Res.*, 385 Md. 534, 553 (2005). As we said in *Comptroller v. Johns Hopkins Univ.*, 186 Md. App. 169, 188-89 (2009), "the Tax Court is the agency charged with interpreting and applying the Maryland tax code," and therefore its decision on a "mixed question of law and fact" is given deference.

And even though we review the Tax Court's decision of pure law de novo, its "interpretation and application of the statute" it administers is often accorded "a degree of deference" and "given considerable weight." *Townsend Baltimore Garage v. Supervisor of Assessments*, 215 Md. App. 133, 140 (2013). We do not, however, extend deference to the Tax Court's "application and analysis of case law." *Gore*, 437 Md. at 505.

## DISCUSSION

### I.

In administering Maryland income tax laws, "to the extent practicable, the Comptroller shall apply the administrative and judicial interpretations of the federal income tax law." Md. Code Ann., Tax - General § 10-107. Section 166(a) of the Internal Revenue Code ("IRC") allows deductions for debt that becomes worthless within the taxable year. 26 U.S.C. § 166 (1988).[7] But only bona fide business bad debt is deductible as an ordinary loss. *Id.*; *Kean v. Comm'r*, 91 T.C. 575, 594 (1988). A contribution to capital is not business debt under the statute. 91 T.C. at 594.

---

[7] (a) General rule.--
(1) Wholly worthless debts.--There shall be allowed as a deduction any debt which becomes worthless within the taxable year.
(2) Partially worthless debts.--When satisfied that a debt is recoverable only in part, the Secretary may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction.
(b) Amount of deduction.--For purposes of subsection (a), the basis for determining the amount of the deduction for any bad debt shall be the adjusted basis provided in section 1011 for determining the loss from the sale or other disposition of property.
                                                    * * *
(d) Nonbusiness debts.--
(1) General rule.--In the case of a taxpayer other than a corporation--
(A) subsection (a) shall not apply to any nonbusiness debt; and
(B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 1 year.
(2) Nonbusiness debt defined.--For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than--
(A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or
(B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business.
                                                    * * *

The Comptroller contends that the Tax Court erred in finding that the unpaid advances Mr. Jalali made to M&I and WDJ were bona fide loans rather than capital contributions. The Jalalis, of course, disagree.

**A.**

Before we can answer whether the Tax Court erred in concluding that the advances made by Mr. Jalali were bona fide loans, we must first determine whether that is a question of law, a question of fact, or a mixed question of law and fact. As the Comptroller notes, the federal appellate courts are divided on what is sometimes referred to as the "debt-equity" question,[8] and Maryland appellate courts have not yet weighed in on the issue. The Jalalis contend that the Fourth Circuit's conclusion that the question is one of fact should be controlling on this Court because that court is the federal circuit court of appeals in the taxpayer's district. In support, they cite two U.S. Tax Court cases, *Golsen v. Comm'r*, 54 T.C. 742 (1970) and *Lardas v. Comm'r*, 99 T.C. 490 (1992).

We may consider the Fourth Circuit's position on the issue as persuasive authority, but we are not bound by the holdings of the federal circuit courts of appeals.

---

[8] The Fourth, Sixth, and Ninth Circuits see it as a question of fact. *Piedmont Minerals Co. v. United States*, 429 F.2d 560, 562 (4th Cir. 1970) ("[W]e held . . . that the classification of such advances as debt or equity is a question of fact. In this case the Government . . . now urges that we . . . hold that the question in [sic] one of law. We decline to do so."); *Roth Steel Tube Co. v. Comm'r*, 800 F.2d 625, 629 (6th Cir. 1986) ("This court has previously held that the question of whether advances to a corporation constitute capital contributions or loans is a question of fact."); *Bauer v. Comm'r*, 748 F.2d 1365, 1367 (9th Cir. 1985) ("[T]his determination is a question of fact.").

The Fifth and Eleventh Circuits view it is one of law. *Estate of Mixon v. United States*, 464 F.2d 395, 402-03 n.13 (5th Cir. 1972) ("We hold only that the ultimate debt-equity issue . . . is a question of law."); *In re Lane*, 742 F.2d 1311, 1315 (11th Cir. 1984) ("This evaluation presents primarily a question of law.").

8

*See Gayety Books, Inc. v. City of Baltimore*, 279 Md. 206, 213 (1977); *see also Pope v. State*, 284 Md. 309, 320 n.10 (1979); *French v. Hines*, 182 Md. App. 201, 262 n.21 (2008); *cf. Robinson v. Bunch*, 367 Md. 432, 439 (2002) (holding that the Supreme Court's decision on a federal statute is binding on the Maryland Court of Appeals). Moreover, the rule in *Golsen* instructs the *U.S. Tax Court* to "follow a [federal] Court of Appeals decision which is squarely in point where appeal from our decision lies to that Court of Appeals" for the sake of "efficient and harmonious judicial administration." *See* 54 T.C. at 757. And, the U.S. Tax Court has further narrowed *Golsen*'s application only to those cases "where a reversal would appear inevitable, due to the clearly established position of the [federal] Court of Appeals to which an appeal would lie." *Lardas*, 99 T.C. at 494-95; *see also Estate of Burris v. Comm'r*, 82 T.C.M. (CCH) 400 (2001).

That said, the "debt-equity" question is, in our view, not purely or primarily one of law or one of fact, but rather a mixed question of law and fact that we review for substantial evidence. The Court of Appeals of Maryland has held that a difference in views "not as to the law governing the case—but rather as to its proper application to the established evidence of record before the Tax Court" was not solely a question of law. *Ramsay, Scarlett & Co. v. Comptroller*, 302 Md. 825, 837-38 (1985) (the issue before the Court was whether the Tax Court properly determined whether a corporation was unitary or binary for tax purposes). In *Ramsay*, the Court found that there was "no error of law in the Tax Court's utilization of the [established legal] tests," no "failure on the part of the Tax Court to comprehend the legal substance of those tests," and no "agency misapplication of their precepts to the evidence before it." *Id.*

In short, substantial evidence review is accorded to an agency's "application of law to a specific set of facts." *Charles Cty. Dep't Of Soc. Servs. v. Vann*, 382 Md. 286, 298 (2004). Here, it does not appear that the Comptroller is seriously disputing the Tax Court's findings of fact. The Comptroller's argument is directed more to the Tax Court's application of the law to those facts.

**B.**

A deduction under IRC § 166 requires a "genuine intention to create a debt with a reasonable expectation of repayment" that is "consistent with the 'economic reality of creating a debtor-creditor relationship.'" *Flint Indus., Inc. v. Comm'r*, 82 T.C.M. (CCH) 778 (2001) (internal citation omitted). It falls to the trier of fact to evaluate whether the objective facts establish the requisite intention. *Roth Steel Tube Co. v. Comm'r*, 800 F.2d 625, 630 (6th Cir. 1986).

Case law has developed several analytical approaches involving some overlapping factors to guide a trier of fact in answering the debt-equity question. *See, e.g., Roth Steel Tube Co. v. Comm'r*, 800 F.2d 625, 630 (6th Cir. 1986);[9] *Bauer v. Comm'r*, 748 F.2d

---

[9] *Roth* factors: "(1) the names given to the instruments, if any, evidencing the indebtedness; (2) the presence or absence of a fixed maturity date and schedule of payments; (3) the presence or absence of a fixed rate of interest and interest payments; (4) the source of repayments; (5) the adequacy or inadequacy of capitalization; (6) the identity of interest between the creditor and the stockholder; (7) the security, if any, for the advances; (8) the corporation's ability to obtain financing from outside lending institutions; (9) the extent to which the advances were subordinated to the claims of outside creditors; (10) the extent to which the advances were used to acquire capital assets; and (11) the presence or absence of a sinking fund to provide repayments."

1365, 1368 (9th Cir. 1984).[10] Importantly, however, "[n]o single factor is determinative, and not all factors are applicable in each case." 82 T.C.M. (CCH) 778; *see also John Kelly Co. v. Comm'r*, 326 U.S. 521, 530 (1946). For that reason, the "object of the inquiry is not to count factors, but to evaluate them." *Tyler v. Tomlinson*, 414 F.2d 844, 848 (5th Cir. 1969). In other words, the various individual factors are only "aids in answering the ultimate question whether the investment, analyzed in terms of its economic reality, constitutes risk capital . . . or represents a strict debtor-creditor relationship." *Fin Hay Realty Co. v. United States*, 398 F.2d 694, 697 (3d Cir. 1968).

Here, the Tax Court concluded that the advances "were loans and not contributions to capital." "Findings" that we have distilled from the Tax Court's oral decision at the end of the hearing and numbered for reference purposes in this opinion include the following:

1. "[T]he company was doing really well[.] Mr. Jalali had taken the company from a maybe one or $2 million company to a 20 to $25 million company. They were paying their taxes on time[.] [E]verything was going really well[.] [A]nd then . . . it's kind of a perfect storm, he decided to take on three major contracts of over $30 million . . . and it put the company in a serious . . . cash flow situation.

   * * *

   [W]hat happened basically is [Mr. Jalali and his business] got too big too fast, couldn't make cash flow, was over his borrowing base,

---

[10] *Bauer* factors: "(1) the names given to the certificates evidencing the indebtedness; (2) the presence or absence of a maturity date; (3) the source of the payments; (4) the right to enforce the payment of principal and interest; (5) participation in management; (6) a status equal to or inferior to that of regular corporate creditors; (7) the intent of the parties; (8) "thin" or adequate capitalization; (9) identity of interest between creditor and stockholder; (10) payment of interest only out of "dividend" money; and (11) the ability of the corporation to obtain loans from outside lending institutions."

11

was doing the best he could under the circumstances. He had over 80 percent of the stock [in WDJ] so basically he was all in."

2. The companies "had lines of credit with borrowing base, based on $3 million, which [they] from time to time used in order to provide short-term tax flow . . . ."

3. Documentation identified the advances as "promissory notes." "The corporate books [and] the promissory notes . . . indicate to this Court that [Jalali's] intent was these were not capital infusions, these were loans he made to the various companies for the purpose of trying to make sure his companies survived."

4. "Three [promissory notes] were basically repaid."[11] They all contained "time certains." Mr. Jalali couldn't make repayments on time, but "since he owned the company he paid the ones he could and those were identified in the record . . . [and] on all the documentation corporately."

5. Only the principal of some notes were repaid and without interest, despite all of the notes stating a 5% interest rate. The companies "couldn't make the payments in time" and were not financially able to pay any interest, but had they been able to, they would have repaid the advances with interest.

6. "There was no security available because the banks had basically had everything tied up to the best of their ability."

7. "The fact that [Mr. Jalali and several companies] filed bankruptcy doesn't necessarily mean that he did not have the intent at the time that he made these loans [or] that he did not expect them to be repaid. I believe he did expect them to be repaid."

8. These were "short-term notes" because Mr. Jalali "hoped, as the money came in from the contractors that he had business with, that he would be paid."

---

[11] As noted, only one of the promissory notes at issue, in the amount of $133,000, was repaid. Two other loans from Mr. Jalali to WDJ and related companies that were made during the tax years 2008 and 2009 were referred to in testimony and their repayment was reflected on the corporate records. Their repayment supports a history of Mr. Jalali making loans to the companies and being repaid during the 2008-2009 time period.

9.     Mr. Jalali didn't receive additional stock.

10.     The advances were "absolutely well documented" on the corporate records and "properly filed on his income tax returns." "[A]t the time the hearing officer made a determination that these were not loans . . . the IRS had not weighed in on the situation." But, since then, "the IRS determined that these were in fact NOLs and granted the taxpayers, Mr. Jalali and his wife, refunds."

The Tax Court concluded that "in determining the facts of this case . . . based on the totality of circumstances and . . . the economic reality of these transactions . . . [Mr. Jalali's] intent was to make short-term loans."

Citing *Piedmont Minerals Co. v. United States*, 429 F.2d 560, 562 n.4 (4th Cir. 1970),[12] the Comptroller argues that the Tax Court placed gross overemphasis on three factors: the presence of promissory notes; the history of repayment of Mr. Jalali's advances; and Mr. Jalali's subjective intent. In the Comptroller's view, the focus on Mr. Jalali's subjective intent caused the Tax Court to exclude proper consideration of those factors favoring an equity contribution determination, such as not observing maturity dates, not collecting interest, the inadequate capitalization of the companies,[13] the lack of outside financing, the identity of interest between the creditor and the shareholder,[14] and the lack of security or a sinking fund.[15] The Comptroller also argues that the Tax Court

[12] In *Piedmont*, the court noted that a "gross overemphasis on one relevant principle to the exclusion of others" or "disregard of the applicable principles of law" would warrant reversal, but held that the lower court in that case did not err in determining that advances in question were debt and not equity.

[13] In 2009, WDJ's debt-to-equity ratio was approximately 5:1. M&I was not capitalized when it formed in 2008 and had no apparent equity.

[14] Mr. Jalali was both the creditor and a shareholder in the companies.

[15] In regard to security, the Tax Court stated that "in order to have a valid net operating loss you don't have to necessarily have security." As to a "sinking fund," it

13

improperly considered irrelevant factors, such as no additional stock having been issued and the IRS's determination to grant the deduction.[16]

Contrary to the Comptroller's contention, we are not persuaded that the Tax Court disregarded applicable principles of law or grossly overemphasized a few factors to the exclusion of others. In fact, the Tax Court remarked that it was "pretty familiar with these kinds of things because this is sort of what [it] do[es]." Rather, the record as a whole reflects, in our view, consideration and evaluation of many of the *Roth-Bauer* factors in answering the "ultimate question": Did Mr. Jalali have a genuine intention to create the debt with a reasonable expectation of repayment that was consistent with economic reality?

The Tax Court's findings reflect consideration of many of the *Roth-Bauer* factors (noted in footnotes 9 and 10 above), including, for example:

Finding #2: Ability to obtain outside financing          *Roth* (8); *Bauer* (11)

stated, "nobody would establish a sinking fund if you don't have enough money to pay the bank."

[16] The Comptroller, citing *Bert v. Comptroller*, 215 Md. App. 244, 266 (2013), argues that the IRS determination is not a relevant factor because the Comptroller and the Tax Court are not bound by the IRS determination. The Jalalis argue that the IRS's determination supports the Tax Court's conclusion that the advances were loans. They advance the proposition, citing *Dennis v. Fire & Police Employees' Ret. Sys.*, 390 Md. 639, 660 (2006), that "where the resolution of an issue of Maryland law depends in part on the resolution of an issue of federal tax law, [] an IRS determination . . . should be afforded a degree of deference similar to the deference we afford to the decisions of Maryland administrative agencies."

We note that *Bert* related to whether a determination of "adjusted gross income" by the IRS was binding on the Comptroller, and we determined the Comptroller was entitled to recalculate the adjusted gross income figure when the federal return figure was incorrect because of the taxpayer's failure to report income. In *Dennis*, which involved whether a pension plan qualified under IRC § 401, the Court of Appeals of Maryland extended deference to the IRS determination of federal tax law.

14

Finding #3:   Name of instruments                      *Roth* (1); *Bauer* (1)

Finding #4:   Fixed maturity date; payment schedule   *Roth* (2); *Bauer* (2)

Finding #5:   Interest rate and payments              *Roth* (3)

Finding #6:   Security                                *Roth* (7)

Finding #7:   Subjective intent                       *Bauer* (7)

Finding #8:   Source of repayments                    *Roth* (4); *Bauer* (3)

Certain factors that the Comptroller asserts that the Tax Court did not give proper consideration were considered in the context of how quickly things went bad in 2009. For example, the Tax Court found that the failure to observe maturity dates and collect interest was the result of the "perfect storm" that, in the end, financially ruined the companies (Finding #1), but that interest would have been paid had the companies survived (Finding #5). The lack of security was, as noted, expressly addressed by the Tax Court. In addition, some of the factors referred to by the Comptroller would not necessarily, based on the record, have weighed heavily against the Jalalis, including the identity of interest between the creditor and the shareholder[17] and the availability of outside lending. In Finding #2, the Tax Court found that outside lending was available to the companies because of PEPTEC's $3 million line of credit from a bank, which was

---

[17] As to the identity of interest between Mr. Jalali and the two companies, the Tax Court was not required to weigh this factor heavily against Mr. Jalali. As the *Roth* Court stated, "A sharply disproportionate ratio between a stockholder's percentage interest in stock and debt is . . . strongly indicative that the debt is bona fide," but "advances [] made by stockholders in proportion to their respective stock ownership" indicate an equity contribution. *See Roth*, 800 F.2d at 630. Although the ratio of debt to stock was not disproportionate in the case of M&I (he was the only shareholder), none of the shareholders in WDJ except Mr. Jalali advanced money.

used to alleviate short-term tax flow issues. In addition, M&I had a $1 million factoring agreement beginning in December 2009. This outside credit was available until sometime in 2010; the advances were made in 2009. Mr. Jalali testified that he did not know that he would not be paid until about the middle of 2010.

The Tax Court did consider the Comptroller's arguments regarding the economic reality of repayment in light of the "totality of the circumstances." For example, it stated:

> The Court understands from the Comptroller's standpoint why initially they would think under the circumstances based on the bankruptcies [that the advances were capital infusions]. [B]ut this happened over a period of . . . maybe six months to a year. This is not something that was happening long-term, this was a short-term situation that unfortunately [Mr. Jalali] got himself into when he took on three contracts that . . . his company just couldn't handle.

In regard to his expectation of repayment, Mr. Jalali testified that he expected, as in the past, repayment of the monies advanced upon the completion of the Three Projects. That was reasonable, in his view, because the three contracts were either government contracts or bonded commercial contracts worth approximately $30 million in expected income. In other words, repayment would come with the completion of the Three Projects, which is why the Tax Court found that the advances were made in the form of "short-term notes." That, in the end, he was not repaid does not mean that his expectation of repayment was unreasonable and inconsistent with economic reality when the advances were made.

In short, the Tax Court applied correct legal principles, evaluated the applicable factors in light of the circumstances, made findings of fact and drew inferences from those facts, and reached a conclusion that "a reasoning mind reasonably could have reached." *Frey*, 422 Md. at 137.

16

The Comptroller contends that even if Mr. Jalali's advances are properly determined to be debt, it is non-business bad debt and therefore non-deductible. This issue was neither raised nor addressed in the Tax Court, but the Comptroller argues that the taxpayers had the burden to establish that the unpaid loans were business bad debt because this issue was raised in the Notice of Final Determination.[18] The Comptroller asks us to reverse the Tax Court and affirm the Notice of Final Determination. But, if we do not, the Comptroller asks that we remand the matter back to the Tax Court to determine the business or non-business nature of the advances under § 166(d).

The Jalalis contend that this issue is not properly before us because it relates to a different section of the federal tax code, and was not raised by the Comptroller as an issue before the Tax Court or in the Notice of Final Determination. They argue that to allow the Comptroller to advance a new contention for the first time on judicial review would tie up the judiciary in an endless circle of hearings, appeals, and remands.

On judicial review of administrative agency decisions, we do not ordinarily "pass upon issues presented to [us] for the first time on judicial review." *Schwartz*, 385 Md. at 555-56 (quoting *Brodie v. Motor Vehicle Admin.*, 367 Md. 1, 4 (2001)); *see also Halici v. City of Gaithersburg*, 180 Md. App. 238, 248-49 (2008). We are instead restricted to the record before the Tax Court and do not consider issues that are not encompassed in its

---

[18] The Notice of Final Determination stated in its text, "Because taxpayers have not demonstrated that they made a bona fide loan, it is unnecessary for the hearing officer to determine whether the claimed bad debt deduction was taken in the right way and whether it was a business or non-business bad debt."

final decision. *See Mueller v. People's Counsel for Baltimore Cty.*, 177 Md. App. 43, 89 n.19 (2007); *Dep't of Health & Mental Hygiene v. Campbell*, 364 Md. 108, 123-24 (2001) (holding that the circuit court erred in awarding attorneys' fees because the issue was never raised or decided by the ALJ). In other words, we do not "resolve matters *ab initio* that have been committed to the jurisdiction and expertise of the agency." *See Halici*, 180 Md. App. at 249 (quoting *Chesley v. City of Annapolis*, 176 Md. App. 413, 417 n.7 (2007) (internal citations omitted)).

And, as Maryland Rule 8-131(a) instructs, "Ordinarily, the appellate court will not decide any other issue [besides jurisdiction] unless it plainly appears by the record to have been raised in or decided by the trial court, but the Court may decide such an issue if necessary or desirable to guide the trial court or to avoid the expense and delay of another appeal." This rule applies to appellate review of administrative proceedings. *See, e.g., Marks v. Criminal Injuries Compensation Bd.*, 196 Md. App. 37, 75 (2010). The policy behind the rule is to "ensure fairness for the parties involved and to promote orderly judicial administration." *Id.* (quoting *Jones v. State*, 379 Md. 704, 714 (2004)). "Unfair prejudice" can result "when a party seeks review of an issue that could have been addressed by the lower tribunal." *Id.*

Here, the Notice of Final Determination clearly indicated that the basis for denial was lack of acceptance by the IRS of the amended return for 2008 and the determination that the advances were not bona fide loans with a "reasonable expectation of repayment." That the advances did not qualify as business bad debt was not a stated basis for the denial of the amended returns. The Notice of Final Determination stated only that it was

unnecessary for the hearing officer to determine whether the debt was a business or non-business bad debt.

We find no place in the record where the Comptroller even raised with the Tax Court Mr. Jalali's failure to prove that the unpaid loans constituted a business bad debt under § 166(d) when that issue could have been easily advanced by the Comptroller. In short, this issue is not before us. We are not persuaded under the circumstances to remand to the Tax Court for it to consider an issue that was never presented to it. To do so now, as we explain below, would be unfairly prejudicial to the Jalalis and would, in no way, "promote orderly judicial administration."

As we have discussed, IRC § 166(a) allows for debt that becomes worthless within a taxable year to be deductible, but the statute distinguishes between business bad debt and non-business bad debt. *See* 26 U.S.C. § 166(b), (d).[19] The former is deductible, and the latter is treated instead as a loss resulting from the sale or exchange of a short-term capital asset. *See id.*; 26 U.S.C. § 1211(b), 1212(b); *Flint*, 82 T.C.M. (CCH) 778.

Classifying a debt as business or non-business involves a determination of whether the debt was "incurred . . . in a trade or business rather than in some other activity." *Dagres v. Comm'r*, 136 T.C. 263, 280 (2011); *see also Garner v. Comm'r*, 987 F.2d 267, 270 (5th Cir. 1993). Federal regulations require a "'proximate relationship' between the debt and the taxpayer's business." 987 F.2d at 270 (citing Treas. Regs., 26 C.F.R. § 1.166-5(b)(2) (1980)).

---

[19] *Supra* note 7.

A taxpayer, who makes a loan to a company in which he is both a shareholder and an employee, usually acts with two motivations—to protect his investment and to protect his employment. The Supreme Court has held that in determining whether the bad debt has a "proximate relationship" to the taxpayer's business, the protection of the employment must be the "dominant motivation." *United States v. Generes*, 405 U.S. 93, 103-04 (1972). In *Generes*, the taxpayer, who owned 44% of the stock of a closely-held corporation and received an annual salary of $12,000 for serving as its president on a part-time basis, advanced money to the corporation which he later claimed as a deductible business bad debt. *Id.* at 97-100. A jury was asked to determine whether the advances were proximately related to his business of being an employee of the corporation, and it was instructed that the legal standard was that of "significant motivation." *Id.* The Supreme Court reversed, holding that the wrong standard was used, and further, that nothing in the record would support a jury verdict favoring the taxpayer based on the "dominant motivation" standard. *Id.* at 106-07.

Investment in and of itself does not qualify as a trade or business, but an investment component to the motivation to make the loan does not automatically render the loan a non-business debt. *Dagres*, 136 T.C. 263, 281 (2011). Employment, however, must be the dominant motivation for making the loan. *Garner*, 987 F.2d at 270. That employment is the dominant motive can be supported by evidence that the taxpayer formed the company principally to be employed, the risk of the loan in relation to the taxpayer's investment's value, and that the taxpayer spent a large portion of time working for the company. *See Litwin v. United States*, 983 F.2d 997, 1000 (10th Cir. 1993). The

20

*Litwin* Court held that objective evidence that the taxpayer formed the company principally to be employed and to earn a salary indicated that the loans from the taxpayer were motivated by business purposes. *Id.* at 1000-01. And even though he deferred his salary for three years, he spent a large portion of his time working for the company, as CEO and board chairman, and managing its business affairs. *Id.* The *Litwin* Court noted further that the *Generes* "dominant motivation" holding had not been "reduced" to "a simple, mathematical calculation," but requires a case by case analysis. *Id.* at 999-1001.

The Comptroller asserts that Jalali was an employee of PEPTEC, and only a shareholder in WDJ and M&I, the two companies to which he advanced money. For that reason, the Comptroller concludes that his dominant motivation in making those advances was to protect his investment and not his employment. But that, in our view, does not necessarily follow. The record indicates that Mr. Jalali was in the HVAC business, including the sales, manufacture, and installation of the units, and the companies all served that business. Mr. Jalali testified that his working life had been devoted to that business and that his goal in making the loans was to protect the business relationships that he had established over the years. Like the shareholder/employee in *Litwin*, Mr. Jalali formed WDJ and M&I to facilitate the business from which he earned his living. He had worked at PEPTEC since 1993, and spent a large portion of his time managing the business, holding the position of CEO in PEPTEC. As the Notice of Final Determination indicated, "Mr. Jalali testified that the businesses were his only source of income." There is, in our view, sufficient evidence on this record to support a finding,

had the issue been raised and a finding been made, that Mr. Jalali's dominant motivation for making the loans was to protect his employment in the HVAC business.

**JUDGMENT AFFIRMED. COSTS TO BE PAID BY APPELLANT.**

22